# UNITED STATES TRUST COMPANY *v.* WABASH WESTERN RAILWAY COMPANY.

# WABASH WESTERN RAILWAY COMPANY *v.* UNITED STATES TRUST COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

Nos. 51, 57. Argued October 23, 24, 1893. — Decided November 20, 1893.

On the 10th of February, 1879, the Council Bluffs and St. Louis Railway Company leased their projected railway from Council Bluffs to the state line to the St. Louis, Kansas City and Northern Railway Company for the term of 91 years. Together the lines formed the Omaha Division of the Wabash system. On the 15th of February, 1879, the lessee issued bonds to the amount of $2,350,000, secured by a mortgage to the United States Trust Company, to complete and equip the division. In November, 1879, the lessee was consolidated with the Wabash Railway Company, under the name of the Wabash, St. Louis and Pacific Railway Company. The new corporation assumed all the obligations of the old ones, entered into possession of all the property, issued bonds to the amount of $17,000,000, secured by a general mortgage to the Central Trust Company, and other bonds, and continued to operate the property down to May, 1884, when it filed a bill alleging its own insolvency, and asking the court to appoint receivers of all its property, which was done. A preferential indebtedness was recognized by the court to the extent of $4,378,233.49, which the receivers were directed to pay. The rentals and interest amounted to $2,175,062, of which $82,250 was for the rent of the Omaha Division. These also were ordered to be paid by the receivers. It turned out, practically, that so far from being able to make all these payments out of earnings, they were never enough to pay the preferential debts, and that the Omaha Division was operated at an actual loss, without taking the rental into account. These facts were made known to the court by the receivers in March, 1885, whereupon it ordered, in April, 1885, that the subdivisional accounts be kept separately, and that no rent or subdivisional interest be paid where a subdivision earned no surplus. It also ordered the preferential debts to be paid before rentals. The instalment of rent or interest on the Omaha Division due in April, 1885, not being paid, a bill was filed to foreclose the mortgage upon it, and when a default took place in the payments due in October, 1885, a receiver was asked for. In the following March a receiver was appointed

as asked for, and the Omaha Division was surrendered to him by the general receivers of the Wabash system. He intervened in the Wabash suit, praying for payment by the general receivers of the overdue rent on the Omaha Division, amounting to $222,075.77. A decree of fore-closure and sale of the Wabash system, under the general mortgage, was entered, which reserved specially all rights under the Omaha Division, and under this decree a sale was made and the property was transferred to a new corporation called the Wabash Western Railway Company. The petition for the payment of rent of the Omaha Division, after reference to a master and report by him, resulted in a decree for the payment of one month's rent with interest, instead of 16 months, as prayed for. *Held,*

(1) That the court was bound to take into consideration the peculiar cir-cumstances under which the receivers took possession of and operated the Wabash system;

(2) That, following *Quincy, Missouri &c. Railroad* v. *Humphreys,* 145 U. S. 82, the court did not bind itself or its receivers to pay the agreed rent *eo instanti* by the mere act of taking possession, but that reasonable time had to be taken to ascertain the situation of affairs;

(3) That the order made by the court below to pay the rents only after the discharge of the preferential debts was correct;

(4) That the owners of the Omaha branch, or the trustees of its mort-gage, knowing that that branch was in the hands of the general receivers, might have intervened in that suit for the protection of their property, and were bound by the order for payment of the preferential debts; as it is settled that whenever, in the course of a receivership, the court makes an order which the parties to the suit consider injurious to their interests, it is their duty to file a motion at once asking the court to cancel or to modify it;

(5) That the petition of the receivers of March, 1885, and the order of the court thereupon touching subdivision earnings, was notice to the branch lines that they must not expect payment of their rent, when the subdivision earned nothing beyond operating expenses;

(6) That as the mortgage to the United States Trust Company did not convey the income or earnings of the road to it, but only author-ized it to take possession in case of default, the trustee could only secure the earnings by taking possession in such case;

(7) That until the mortgagee asserted its rights under the mortgage to the possession of the road by filing a bill of foreclosure and by demanding possession, it had no right to receive the earnings and profits;

(8) That the judgment of the court below, awarding a recovery of only one month's rent, was right.

The general rule applicable to this class of cases is, that an assignee or receiver is not bound to adopt the contracts, accept the leases, or other-

wise step into the shoes of his assignor, if, in his opinion, it would be unprofitable or undesirable to do so.

In such case a receiver is entitled to a reasonable time in which to elect whether he will adopt or repudiate such contracts.

If a receiver in a suit for foreclosing a railway mortgage elects to adopt a lease, he becomes vested with the title to the leasehold interest, and a priority of estate is thereby created between the lessor and the receiver, by which the latter becomes liable upon the covenant to pay rent.

THESE were cross appeals from a final decree entered September 25, 1889, overruling the exceptions of the appellant, the United States Trust Company, to a master's report, overruling in part the exceptions of the appellant, the Wabash Western Railway Company, to the same report, and adjudging that the Trust Company, as trustee under the mortgage of what is known as the Omaha Division of the Wabash, St. Louis and Pacific Railway, recover from the Wabash Western Railway Company the sum of $13,708.33, with interest thereon from January 6, 1886, amounting in all to $16,765.51, as rental for that division during the period in which it was operated by the receivers of the Wabash Company.

At the time the petition in this case was filed, the Wabash, St. Louis and Pacific Railway Company, a corporation formed by the consolidation of a large number of railway companies, extending from Detroit and Toledo in the East to Omaha and Kansas City in the West, with a total mileage of 3600 miles, of which railway the St. Louis, Kansas City and Northern Railway was a branch, was in process of winding up and reorganizing under two bills, namely: 1. A bill filed May 27, 1884, by the Wabash, St. Louis and Pacific Railway Company itself, wherein it set forth its own insolvency, its inability to meet various pressing debts, including interest due June 1, 1884, on its general mortgage and certain other of its bonds; the consequent danger of a breaking up of its system of railroads, and the irreparable damage that might result from its disruption, and praying for the appointment of receivers to take possession of, preserve, and operate its lines of railroad for the benefit of its creditors, according to their respective legal and equitable rights. To this bill the Central Trust Company of New York and James Cheney, trustees under the Wabash

general mortgage; the United States Trust Company of New York, trustee of the Omaha Division mortgage, as well as the trustees in all the underlying and divisional mortgages on the various lines of the Wabash system, were made defendants. 2. A cross-bill filed June 9, 1884, by the trustees of the Wabash Company, under its general mortgage, for the fore-closure of that mortgage and appointment of receivers of the mortgaged premises.

The petition in this case was filed April 23, 1886, and the case referred to a master upon a stipulation as to the facts, of which the following is a summary : On February 10, 1879, the Council Bluffs and St. Louis Railway Company, an Iowa corporation, the owner of a projected railway sixty-five miles in length from Council Bluffs, Iowa, in a southeasterly direction to a point on the state line between Iowa and Missouri, leased its road to the St. Louis, Kansas City and Northern Railway Company, the owner of another railway extending from that point on the state line about seventy-eight miles to Pattons-burg, Missouri, for the term of ninety-one years. These roads formed a line from Pattonsburg, Missouri, to Council Bluffs, Iowa, and are known in this litigation as the Omaha Division of the Wabash system. On the 15th day of February, 1879, the said St. Louis, Kansas City and Northern Railway Company, for the purpose of raising funds necessary to complete and equip the Omaha Division, issued and sold $2,350,000 in bonds, or at the rate of $16,000 for each mile, and to secure the payment thereof mortgaged its interest and estate in the whole of such division, being an estate in fee in that portion of the line situated in Missouri and its leasehold estate in that part located in Iowa, to the United States Trust Company.

In November, 1879, the St. Louis, Kansas City and Northern Railway Company of Missouri was consolidated with the Wabash Railway Company, under the corporate name of the Wabash, St. Louis and Pacific Railway Company. By the terms of such consolidation the new corporation assumed all the obligations of both the constituent-companies. Imme-diately upon such consolidation the Wabash, St. Louis and Pacific Railway Company entered upon the sole use of the

premises demised by said lease, and on June 1, 1880, issued $17,000,000 of what were known as its general mortgage bonds, secured by a mortgage to the Central Trust Company of New York and James Cheney as trustees. This mortgage covered all its railway, leasehold, and other property. By a later mortgage, dated May 1, 1883, to the Mercantile Trust Company of New York, 11,089 shares of stock of the Council Bluffs and St. Louis Railway Company were pledged with a large amount of other property to secure $10,000,000 of what were called the collateral trust bonds of the Wabash Company.

From 1879 to May 27, 1884, the Omaha Division was successfully and profitably operated, and the terms of the lease were complied with. Upon presentation to the court of the first bill above stated, filed by the Wabash Company, alleging its own insolvency, and on May 27, 1884, an order was entered appointing Solon Humphreys and Thomas E. Tutt receivers of all the property of the said Wabash Company. This order appointing the receivers directed them to take possession of, operate, and preserve all of said lines of railroad, and from their earnings pay their operating expenses; the balance due to other railroad and transportation companies growing out of the interchange of traffic during the preceding six months; all rentals accrued, or which should thereafter accrue, on all leased lines for the use of terminals or track facilities; and for all rentals due or to become due upon rolling stock theretofore purchased by the company and partially paid for; likewise, all just claims and accounts for labor, supplies, professional services, salaries of officers, and employés that had been earned or matured during the preceding six months. The receivers were also directed by the order to keep such accounts as might be necessary to show the sources from which all such incomes and revenues were derived, with reference to the interest of all parties to the suit and the expenditures made by them.

On June 26, 1884, within one month after their appointment, the receivers made a report and petition to the court, in which they stated to the best of their information and belief that each and all of certain lines of railroad constituting the

consolidated Wabash, St. Louis and Pacific Railway Company had "at all times during the five years last past, or ever since their construction, earned more than enough to pay their operating expenses, the cost of maintenance, and interest upon the several series of bonds" that were secured upon them by their mortgages or deeds of trust, and prayed the court to instruct them as to what they should do with respect to the payment of interest, as the same from time to time matured, on the mortgage bonds on the several lines and divisions of the road as they existed at and before the date of the consolidation. On June 28, two days after the filing of this petition, the court ordered the receivers, from the incoming rents and profits of the property, after meeting such other obligations as they had been directed to discharge by former orders, to pay from whatever balance might remain in their hands the interest maturing upon the bonds or other mortgage obligations on the several lines or divisions of the Wabash Company before its consolidation. Under this order the rental for the use of the Omaha Division, falling due on October 1, 1884, and amounting to $82,250, was paid by the receivers. Rentals and interest on other lines accruing for the same and various subsequent periods, and aggregating $2,175,062, were paid under the same order.

The record shows that at the time the receivers were appointed the labor and supply claims and other preferential indebtedness of the Wabash Company, which the receivers were, by their order of appointment, directed to pay, amounted to $4,378,233.49. It also appeared that the net earnings of all the lines operated by the receivers were never sufficient to discharge the preferential debts.

On March 20, 1885, the receivers made another application to the court, in which they set forth in detail the earnings and expenses of the various lines of the system up to November 30, 1884, and prayed the court for instruction with respect to the future operation by them of the several branch lines that had failed to earn their operating expenses. Notice was given to the solicitor of the trustee of the Omaha Division that this petition would be called up on the 14th of April. In the

application it was stated that the expenses of operating the Council Bluffs and St. Louis Railway, that is, the Omaha Division, had exceeded its earnings by $5288.64, not including any charge for rental, and, including such charge, there was a deficit of $87,538.64. On April 16 the court made an order upon this petition to the effect that subdivisional accounts should be kept separately; that "where a subdivision earns no surplus, simply pays operating expenses, no rent or sub-divisional interest will be paid. If the lessor or subdivisional mortgagee desires possession or foreclosure, he may proceed at once to assert his rights. While the court will continue to operate such subdivision until some application be made, yet the right of a lessor or mortgagee whose rent or interest is unpaid to insist upon possession or foreclosure will be promptly recognized."

The semi-annual instalment of interest or rent of the Omaha Division falling due April 1, 1885, being unpaid, a bill for the foreclosure of the mortgage upon that division was filed by the intervenor in the Circuit Court of Pottawatomie County, Iowa. The Wabash receivers were made defendants to the bill. This suit was removed to the Circuit Court of the United States for the Southern District of Iowa. Another default occurring October 1, 1885, the intervenor filed a second petition, and requested the transfer of the division to a receiver.

On December 2, 1885, the United States Trust Company filed another petition, in which it recited the defaults which had occurred in the payment of interest on the bonds secured on the Omaha Division, and prayed that the receivers of the Wabash system, Humphreys and Tutt, be ordered to surrender to the receivers, appointed or to be appointed in the foreclosure suits of the Omaha Division, all its property.

On January 6, 1886, the matter was called to the attention of the court, and the court thereupon entered an order directing the receivers, Humphreys and Tutt, to surrender within thirty days the Omaha Division to the United States Trust Company, or to any person or receiver appointed at their instance by the Circuit Court for the Southern District of

Iowa, or by the state courts. There was a further clause in the order which authorized Humphreys and Tutt to retain possession of the Omaha Division for an additional thirty days, if the Wabash, St. Louis and Pacific Railway Company, or any one on its behalf, would pay to the United States Trust Company $13,708.33, which sum was equal to the interest for one month on the Omaha bonds. That amount was paid by the receivers, and there is no controversy here concerning it.

On March 3, 1886, Thomas McKissick was appointed receiver of the Omaha Division, and on March 6 the division was surrendered to him by Humphreys and Tutt. On April 23 the petition in this case was filed by the intervenor for the rental which accrued from October 1, 1884, to February 6, 1886, amounting to $222,075.77.

On the same day the order of surrender was made, namely, January 6, 1886, a decree of foreclosure and sale under the Wabash general and collateral mortgages was entered. This sale specially reserved all rights under the Omaha Division and other leases and mortgages, and adjudged that the receivers' surrender of any leased branch terminated the lease as of the date of the surrender. The sale of the road having been made and confirmed, the receivers were directed to transfer all the property to the Wabash Western Railway Company, a new corporation organized to take the property, the latter company agreeing to pay all claims and demands " growing out of the operation by said receivers of the railway property lately in their charge, which have been or may be adjudged to be superior in equity to the mortgages foreclosed by said decree." The transfer of the entire property was thereupon made to that company, and it has since assumed the defence of the intervenor's claim.

The master to whom the petition of the Trust Company for rent was referred made two reports. By the first report, the Trust Company was allowed a rental of $77,237.06, being a sum equal to the interest on the bonds from October 1, 1884, (the date of the last payment,) to April 16, 1885, the date on which the court ordered that no rent or subdivi-

sional interest would be paid on lines that did not earn a surplus.

To this report the receivers filed exceptions which were sustained by the court, and the case referred back to the master with instructions to report, first, whether the Omaha Division had been retained by the receivers at the instance or for the benefit of the mortgagees under the Wabash general mortgage, after the United States Trust Company had demanded possession thereof; and, second, to ascertain and report what would be a reasonable rental for the line for the time it was so withheld. In his second report the master reviewed at some length the record in the case, and concluded that the value of the use and occupation of the property during the time it was withheld from the intervenor was the *pro rata* amount of the rental provided for in the lease, namely, $13,708.33 per month; that the intervenor had received the rental for thirty days of the period of detention, and was entitled to receive pay for two months more, or the sum of $27,416.66.

To this report both parties, the receivers and the Trust Company, excepted, and these exceptions having been filed, the court, on September 25, 1889, entered a decree that the exceptions should be sustained in so far as the report found that the intervenor was entitled to recover two months' rent of the mortgage property at the rate of $13,708.33 per month; but in so far as the report found that the intervenor was entitled to recover one month's rent, it was confirmed, and a final decree was entered for $13,708.33 and interest from January 6, 1886, making an aggregate amount of $16,765.51.

From that decree both parties appealed to this court.

*Mr. Edward W. Sheldon* and *Mr. Theodore Sheldon* for the United States Trust Company.

I. Where receivers elect to retain possession of property, real or personal, held under a contract of lease, they become liable, whether as equitable assignees of the lease or by virtue solely of such election, for the stipulated rent during the period of their possession.

This statement of the law is axiomatic, and includes all classes of receivers. In the case of statutory receivers, liquidators and assignees in bankruptcy, the doctrine proceeds on the ground that on the election being made, the receiver or assignee becomes vested with the title to the leasehold interest, and a privity of estate is thereby created between the lessor and the receiver or assignee, by virtue of which the latter becomes liable on the covenants running with the "land." *Matter of Otis*, 101 N. Y. 580, 585. If any distinction is to be drawn in the case of chancery receivers appointed to preserve property *pendente lite*, while the courts are not always agreed in their reasoning, the liability is said to rest not on the theory of an equitable assignment to the receivers of the unexpired term, but on the fact of their adoption of an existing contract. Many authorities for this proposition might be cited, but the following will serve as illustrations: *Turner v. Richardson*, 7 East, 335; *Thomas v. Pemberton*, 7 Taunt. 206; *In re Oak Pits Colliery Co.*, 21 Ch. D. 322; *In re Silkstone & Dodworth Coal & Iron Co.*, 17 Ch. D. 158; *In re North Yorkshire Iron Co.*, 7 Ch. D. 661; *Ex parte Faxon*, 1 Lowell, 404; *Woodruff v. Erie Railway Co.*, 93 N. Y. 609; *People v. Universal Life Ins. Co.*, 30 Hun, 142; *Martin v. Black*, 9 Paige, 641; *Commonwealth v. Franklin Ins. Co.*, 115 Mass. 278; *People v. National Trust Co.*, 82 N. Y. 283, 288; *In re International Marine Hydropathic Co.*, 28 Ch. D. 470; *In re National Arms and Ammunition Company*, 28 Ch. D. 474; *In re Blackburn & District Benefit Building Soc.*, 42 Ch. D. 343.

This court has recently recognized the doctrine in its relation to both assignees in bankruptcy and chancery receivers. *Sparhawk v. Yerkes*, 142 U. S. 1. See also *Sunflower Oil Co. v. Wilson*, 142 U. S. 313; *Quincy, Missouri & Pacific Railroad v. Humphreys*, 145 U. S. 82; *Peoria & Pekin Union Railway v. Chicago, Pekin & Southwestern Railroad*, 127 U. S. 200; *Thomas v. Western Car Co.*, 149 U. S. 95.

II. The facts of the present case establish the election of the Wabash receivers to assume the lease of the Omaha Division from May 29, 1884, to March 6, 1886.

This period naturally divides itself as follows: (1) From May 29, 1884, to October 1, 1884. Here the intervenor's claim was recognized, and payment of the rental received; (2) From October 1, 1884, to April 16, 1885. All the reasons which justified the payment of October, 1884, govern this second period; and (3) From April 16, 1885, to March 6, 1886.

With the announcement made by the court in April, 1885, our opponents contend that explicit notice was given that rent would only be paid when earned. On our side we contend, first, that the Omaha Division was, both by contemporaneous and subsequent action of court and receivers, exempted from the operation of this announcement; and, second, that the announcement itself never possessed the significance claimed for it.

Underlying the scheme of the bill in this case, as well as of the other pleadings, and the orders, petitions, and opinions filed in the cause, is the constant suggestion of the pressing need and paramount value of maintaining the congeries of roads as a system. That may be said to have been the basis, if not the justifying cause, of this extraordinary receivership. It was not from any philanthropic motive that these leasehold estates were included in the sequestrated property; nor was it until a much later period of the receivership that the theory of an obligation to the public to maintain every railroad which the receivers had undertaken to operate, found expression. Estates held by the Wabash Company on the condition of rent payments, need only have been regarded in the light of ordinary investments. If deemed unprofitable ventures, they could have been omitted from the list of property subjected to the receivership, or at any time thereafter surrendered by the receivers to the respective lessors. Only one conclusion is possible from this positive recognition of the leases, namely, that the continued operation of the leased lines was regarded as beneficial to the system. No occasion exists for speculation as to the receivers' motives. They have definitely expressed their intention and beliefs, and the result is spread upon the record. If their persistent determination

to retain the Omaha Division did not constitute an election, it would indeed be difficult to imagine how, in a case like this, an election could be demonstrated.

III. No special differentiating circumstances prevent. the necessity of the application of the general rule to the present case.

IV. On the theory of a *quantum valebat*, also, the intervenor is entitled to recover, since the retention of the Omaha Division inured directly to the benefit of the receivership property, and to an extent in excess of the intervenor's claim.

It appears from the testimony that from October 1, 1884, to March 6, 1886, the net revenue from business exchanged between the Wabash railroad and the Omaha Division was $1,551,919.25, of which the sum of $1,123,260.13 was set apart to the Wabash Company, and the remainder, $428,659.12, to the Omaha Division. The cost of hauling, the only expense to the Wabash Company in the case of a greater part of this business, was, in the estimation of the Wabash general manager, less than seventy per cent, and may not have exceeded fifty per cent of the revenue received. We thus ascertain that the clear net earnings from the use of the Omaha Division, during the period in question, were, at their lowest estimate, and this a hostile one, about $336,978.04, the equivalent of thirty per cent of $1,123,260.13, and may have equalled $561,630.06. Furthermore, the retention of the division made it possible to operate at a profit and *pay the rentals on* two adjoining leased lines, the Brunswick and Chillicothe and St. Louis, Council Bluffs and Omaha roads. Such a result gave practical justification to the attitude of the Wabash receivers in opposing the surrender or withdrawal of the division, and in instructing their counsel to " keep the road in the system if possible."

While the receivers' reports declared that the Omaha Division for a period of two years and a half barely earned its operating expenses, when the facts are known, we find that *in addition* to the earnings credited to it in the reports, it exchanged independent business with the Wabash Company

which brought into the treasury of that company a clear profit ranging from $336,000 to $561,000, and enabled it to keep possession of and successfully operate eighty additional miles of leased roads. Under such conditions cannot equity be successfully invoked to secure a just compensation for the use of property which has demonstrated its value?

V. The income collected by the receivers is primarily charged with the payment of these claims, with recourse, if necessary, to the corpus of the property.

VI. The decree of the Circuit Court should be modified by increasing the judgment in favor of the intervenor from $16,765.51 to $222,075.77 with interest from February 6, 1886.

*Mr. F. W. Lehmann* for the Wabash Western Railway Company.

*Mr. Wells H. Blodgett* filed a brief for the Wabash Western Railway Company.

*Mr. Thomas H. Hubbard* filed a brief for the Wabash Western Railway Company.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

Stripped of its complications, this case involves to a certain extent the same question disposed of by this court in *Quincy, Missouri & Pacific Railroad* v. *Humphreys*, 145 U. S. 82, namely, whether the receivers of the Wabash system took possession of the leased lines under such circumstances as to charge them with the payment of the agreed rental so long as they retained possession of the lines.

The general rule applicable to this class of cases is undisputed that an assignee or receiver is not bound to adopt the contracts, accept the leases, or otherwise step into the shoes of his assignor, if in his opinion it would be unprofitable or undesirable to do so; and he is entitled to a reasonable time

to elect whether to adopt or repudiate such contracts. If he elect to adopt a lease, the receiver becomes vested with the title to the leasehold interest, and a privity of estate is thereby created between the lessor and the receiver, by which the latter becomes liable upon the covenant to pay rent. *Sparhawk* v. *Yerkes*, 142 U. S. 1, 13; *Sunflower Oil Company* v. *Wilson*, 142 U. S. 313, 322; *Woodruff* v. *Erie Railway*, 93 N. Y. 609; *In re Otis*, 101 N. Y. 580, 585.

In this case, however, we are bound to consider the somewhat peculiar circumstances under which the receivers took possession of and operated the branch lines of the Wabash system. The bill was not an ordinary bill of foreclosure, but a bill filed by the mortgagor corporation for the purpose of preventing the disruption of the system, and securing a winding up of the old corporation and the organization of a new one, to which the various properties of the road should be transferred. The bill, which was certainly one of unusual character, purported to be filed not only for the benefit and in the interest of the mortgagor and the mortgagee, but also in the interest of the large number of branch corporations which were operated under one general management, and were a part and parcel of the Wabash system. Indeed, the bill expressly averred that defaults in the payment of interest were anticipated, and as soon as they should occur a number of suits would be commenced for the appointment of receivers under the original sectional mortgages executed by the leased corporations; that under the terms of such leases the lessor companies would declare a forfeiture of the rights of the complainant; that its road would be broken into fragments and would ultimately be sold in small sections, and a reëstablishment of its unity rendered impossible.

This court has already held in *Quincy &c. Railway Co.* v. *Humphreys*, 145 U. S. 82, 101, that after the appointment of receivers made in pursuance of the prayer of this bill "the court did not bind itself or its receivers" to pay the agreed rentals of a leased line "*eo instanti* by the mere act of taking possession. Reasonable time necessarily had to be taken to ascertain the situation of affairs. The Quincy Company,"

(and the same remark may be made of the Omaha Division,) "as a *quasi* public corporation, operating a public highway, was under a public duty to keep up and maintain its railroad as a going concern, as was the Wabash Company under the contract between them; but the latter had become unable to perform the public services for which it had been endowed with its faculties and franchises, and which it had assumed to discharge as between it and the other company. Its operation could only be continued under the receivers, whose action in that respect cannot be adjudged to have been dictated by the idea of keeping the property in order to sell it, or using it to the advantage of the creditors, or doing otherwise than 'abstain from trying to get rid of the property.'" On May 27, 1884, Humphreys and Tutt were appointed receivers of the property and were directed to pay certain preferred claims, including rentals accrued or which might thereafter accrue, upon leased lines. On June 26, the receivers reported to the court that, from the incoming rents and profits of the property, they were unable to pay on June 1 the interest falling due upon certain divisional bonds, and prayed the advice of the court as to paying the interest on these bonds, and as to how they should dispose of the earnings of the other lines or divisions which had not and would not for the present be enough to pay the operating expenses, the cost of maintenance, and the interest upon the bonds. This petition was referred to a master, who made a report on June 28, upon which an order of court was entered that the receivers, "from the incoming rents and profits of said property, after meeting such other obligations as they have been directed to discharge by the former order of this court, pay from whatever balance may remain in their hands the interest, as the same may from time to time mature upon the following bonds," including those of the Omaha Division.

If this order of June 28 had been, as the court below seems at first to have construed it, (*Central Trust Co.* v. *Wabash &c. Railway*, 34 Fed. Rep. 259, 266,) "couched in such language that the intervenor had a right to rely upon it, and expect the payment of his rent, until some other order was made," there

would be strong reason for saying that the receivers would be obligated to pay this interest as it matured. But upon a more careful examination of this order, upon a rehearing, the court came to the conclusion that it was not an absolute order to pay, but only an order to pay *after the preferential debts had been discharged.* 38 Fed. Rep. 63. We have no doubt of the correctness of this conclusion. The language of the order was that the receivers, " from the incoming rents and profits of said property, *after meeting such other obligations as they have been directed to discharge by the former order of this court, pay from whatever balance may remain in their hands.*" The other obligations they had been directed to discharge were fixed by the order of their appointment of May 27, as traffic balances, rentals accrued or to accrue upon leased lines, and for the use of terminal facilities and rolling stock, claims for labor, supplies, professional services, and salaries, maturing within six months before making the order, and current expenses for the operation of the road. It is true, as argued by the intervenors, that among the preferred claims mentioned in this order were the rentals due and to become due on leased lines, and that there was no order of payment or relative rank fixed between the preferred claims themselves, the court evidently supposing that the income of the road would be sufficient to pay all the preferred debts. It was impossible, however, for the court, in making the order of June 28, to have contemplated that the rental due the Omaha Division should be a preferred claim, inasmuch as the whole object of the order of June 28 was to provide for the payment of the interest due upon the bonds of this division, after the payment of preferred claims. There is an apparent incongruity between the two orders, but we think it clear that the object of the order of June 28 was, as stated, to pay only from the balance after the payment of the preferred claims, not including as a preferred claim the claim for rental.

The owners of the leased lines were fully apprised by this order of the fact that payment of interest upon their bonds was conditional upon such balance existing; and the fact was that, after paying the operating expenses of the lines and the

labor and supply debts of the Wabash Company, there was never a balance in the hands of the receivers out of which they could pay either interest or rentals. In fact, the preferential indebtedness which the receivers were, by the order of May 27, directed to pay, amounted to over $4,000,000, and the total gross earnings of all the lines of the system, from the day the receivers were appointed to the time the Omaha Division was surrendered to its trustee, lacked over $2,000,000 of being sufficient to pay the operating expenses and the labor and supply debts of the Wabash Company. The receivers did in fact pay the agreed rental of the Omaha Division up to October 1, 1884, to the amount of $82,250. Now, if the owners of the Omaha branch or the trustees of its mortgage, knowing as they did that the system of which their road was a part had gone into the hands of receivers, and was being operated by them, had desired to repossess themselves of their property, or to object to the order of June 28, they should have intervened and asked the court to protect their interests. While they may not have been parties to this order directly, they were parties to the bill, and were bound to know that their property, in the hands of the receivers would or might be affected by orders which the court would make in the course of the administration of the insolvent estate, and should have made themselves parties to the proceedings that their rights might be protected. As was said in *Miltenberger* v. *Logansport Railway*, 106 U. S. 286, of certain mortgage creditors who had intervened to claim that certain expenditures had been made by receivers without authority, " it did not comport with the principles of equity for the appellants to lie by and see the court and the receiver dealing with the property in the manner now complained of, and content themselves with merely protesting generally and disclaiming all interest under the receivership, and yet assert . . . that the other property acquired by the receiver, and now alleged to have been acquired by him without authority, was subject to the lien of the first mortgage, and now claim the proceeds of all that property, without paying the debts incurred in acquiring it. A court of equity, however it might act on the question of

original authority or discretion, if presented in season and under circumstances of good faith, will not visit upon innocent parties dealing with a receiver within the authority of its orders, consequences which result from the inequitable negligence and supineness of a party to the suit, or of those represented by him." So in *Meyer* v. *Johnson*, 53 Alabama, 237, 350, it is stated, inferentially at least, that whenever, in the course of a receivership, the court makes an order which the parties to the suit consider injurious to their interests, it is their duty to file a motion at once asking the court to cancel or modify it. See also *Wallace* v. *Loomis*, 97 U. S. 146; *Post* v. *Dorr*, 4 Edw. Ch. 1st ed. 412; 2d ed. 425.

It is well understood that, in the foreclosure of railroad mortgages, it often becomes necessary to provide for the payment of preferred claims, and to postpone all rights of ordinary creditors, and even of mortgagees, to these preferred classes, and that this is sometimes done from the necessities of the case without notice to all who may be affected thereby.

Nor is this aspect of the case changed by the fact that the earnings on the Omaha Division had previously been sufficient to pay the operating expenses, cost of maintenance, and interest upon its bonds, and that the receivers thought and believed such earnings would be sufficient to pay the interest as well as the preferred claims. Various things had occurred or might occur, such as failure of crops, injury from floods, or other disasters, to affect its earning capacity, and the trustees were bound to know that the insolvency of the entire system of which their road was a part could hardly fail to affect the value of their securities.

On March 20, 1885, the receivers filed another petition, stating that the earnings of many of the lines had not been sufficient to pay the operating expenses, interest on bonds, and the rentals contracted to be paid, among which lines was the Omaha Division, the expenses of which, not including any charge for rental, had exceeded its earnings by $5288.64, and praying the court to make such orders with respect to the future operation of such lines and the payment of the respective rentals as should seem proper to the court. In response thereto, the

court, on April 16, ordered that subdivisional accounts should be kept separately; that where any subdivision earned a surplus over expenses, the rental or subdivisional interest would be paid to the extent of the surplus; where it earned no surplus, but simply operating expenses, no rent or subdivisional interest would be paid; and where not only was no surplus earned, but an actual deficiency existed, operating expenses would be reduced to a minimum. At the time this order was granted there was some conversation between counsel, in which it was said to be the wish of the receivers not to include in this proceeding the Omaha Division; but it was qualified by the express statement of the receivers that they did not wish to be understood as promising the bondholders the payment of the interest on the bonds within a short period of time under the circumstances.

This order was certainly notice to the branch lines that they must not expect payment of their rental where the subdivision earned nothing beyond operating expenses. The Trust Company, however, did not at this time see fit to intervene and demand possession of the property, but upon default in the payment of the interest due April 1, 1885, filed a bill of foreclosure in the state court; making the receivers parties to the bill. This suit was removed, upon petition of the receivers, to the Circuit Court of the United States. It was not until December 2 that the Trust Company petitioned the court for the surrender of the property. Under these circumstances, we do not think the receivers are chargeable with the unpaid rent. It is possible that the Trust Company acted under a misapprehension of its rights, but it is more probable that ti y expected the earnings of the road would be sufficient to entitle them to their interest under the orders of June 28 and April 16. There appears to have been no good reason why demand was not made long before for the surrender of the property. It is true the receivers filed in the state court an answer consisting of a single sentence denying generally the allegations of the bill, and in November following they removed the case to the Circuit Court of the United States; but there was nothing in all this to prevent the Trust Company from

applying to the United States court for possession of the property.

There is another reason, however, why the Trust Company is not entitled to the rental of this property prior to demanding possession thereof in its bill of foreclosure. The petition avers that by reason of the defaults in the payment of the rentals the receivers "are indebted to your petitioner for the use and occupation of the said demised premises under the said lease." But the mortgage or deed of trust to the Trust Company, the petitioner, did not purport to convey any of the incomes or earnings of the road, but provided that if default should at any time occur in the payment of interest, the trustee should, when requested so to do, take possession of the mortgaged property and operate the same, and collect and receive all the tolls and income thereof. It was also provided that, until such default, the mortgagors should be entitled to have and to hold the possession of the railroad, and collect, receive, and retain all the revenues arising from its use.

There was also a guaranty mortgage executed by the Council Bluffs and St. Louis Railroad Company to the same trustee, conveying all its right, title, interest, and estate in the demised premises with all the mortgagor's rights, privileges, and franchises, acquired or to be acquired, subject only to the lease. Now, if the mortgage had covered the earnings and rentals of the property, and those had constituted a part of the estate conveyed to the Trust Company as security for the bonds, there would be some reason for saying that it would be entitled to recover these earnings and rentals in this action before it demanded possession of the road. But where the mortgage provides that the mortgagor shall remain in possession until default, but when default occurs the trustee may enter, this court has held that the trustee can only secure the earnings of the mortgaged property by taking or demanding possession. And in *Galveston Railway* v. *Cowdrey*, 11 Wall. 459, 483, it was held that, even where the mortgage covered the tolls, income, and profits of the railroad, whenever the company should be in default of payment, but a subsequent clause provided that in case the company should be in default

in payments of principal or interest for three months, the trustees should take possession of the road, and collect and receive the tolls, income, and profits, etc., it was held that, until regular demand was made for the payment of tolls and income, the defendants were not bound to account therefor. So in *Gilman* v. *Illinois & Mississippi Telegraph Co.*, 91 U. S. 603, the trustee in a mortgage, which covered a road with its revenues and incomes, sought to recover as against a general creditor a fund that had been earned before the trustee took possession of the mortgaged property. The deed of trust in that case provided that if default occurred in the payment of interest, the trustee might take possession, and receive the income and earnings of the road, and apply them to the debt secured. The court held that the trustees had no claim upon the fund. In delivering the opinion of the court, Mr. Justice Swayne observed: "It is clearly implied in these mortgages that the railroad company should hold possession and receive the earnings until the mortgagee should take possession, or the proper judicial authority should interpose. Possession draws after it the right to receive and apply the income. . . . In this condition of things, the whole fund belonged to the company, and was subject to its control. It was, therefore, liable to the creditors of the company as if the mortgages did not exist. They in nowise affected it. If the mortgagees were not satisfied, they had the remedy in their own hands, and could at any moment invoke the aid of the law or interpose themselves without it."

In *American Bridge Co.* v. *Heidelbach*, 94 U. S. 798, the mortgage included the rents, issues, and profits of a certain bridge, in so far as the same were not necessary to pay its operating expenses and the cost of keeping it in repair. The question in the case was whether earnings that had accrued from the use of the bridge before the bill of foreclosure was filed by the trustee were covered by the mortgage and prevailed over the rights of a judgment creditor. In this case it was said that "the mortgage could have no retrospective effect as to previous income and earnings. The bill of the trustees does not affect the rights of the parties. It is an

attempt to extend the mortgage to what it cannot be made to reach. Such a proceeding does not create any new right. It can only enforce those which exist already."

There are a number of other cases in this court to the same effect. *Kountze* v. *Omaha Hotel Company*, 107 U. S. 378, 392; *Freedman's Saving Co.* v. *Shepherd*, 127 U. S. 494; *Sage* v. *Memphis & Little Rock Railroad*, 125 U. S. 361; *Dow* v. *Memphis & Little Rock Railroad*, 124 U. S. 652; *Teal.* v *Walker*, 111 U. S. 242.

The substance of these rulings is that until the mortgagee asserts his rights under the mortgage to the possession of the road by filing a bill of foreclosure, or, if the road be in the hands of a third party, by demanding possession of such party, he has no right to its earnings and profits. In other words, there is no privity of contract or of estate between the mortagee and lessee, at least until the mortgagee has taken possession of the property, and become the assignee of the rights of the mortgagor.

On December 2, 1885, the Trust Company made formal application to the court for the transfer and surrender of the Omaha Division to a receiver to be appointed in the suits then pending for the foreclosure of the mortgage. The motion was called to the attention of the court on December 8, and was opposed by counsel for the Central Trust Company of New York, the trustee of the Wabash general mortgage, upon the ground that the application should be postponed until January 4, 1886, when the decree in the Wabash suit would be presented to the court for settlement, and the matter of this petition, as well as all other questions, could be presented and passed upon. This application for the postponement was resisted by the counsel for the United States Trust Company, but was granted by the court, which expressed an unwillingness to permit the further disintegration of the system. No order was made at this time with respect to the rental. Upon the renewal of the application, on January 6, the court ordered a surrender to be made within thirty days, with an option to the Wabash receivers to retain the division for an additional thirty days, on the payment of one month's rent, namely,

$13,708.33. The receivers availed themselves of this option, and paid the rent, with the hope that during that time some arrangement might be made to keep the line within the system, so that the surrender did not actually take place until March, 1886. As the rent for the last thirty days was paid, the sole remaining questions are as to the rent from December 9 to February 6.

The master to whom the case was referred reported that the Trust Company was entitled to the two months' rental at $13,708.33 per month. But the court, upon hearing exceptions to such report, was of the opinion that, while the receivers were liable for the first month's rental, namely, from December 7 to January 6, upon the ground that the delay upon the consideration of the motion was opposed by the counsel of the Trust Company, the further delay of thirty days was with their consent, hence, that they were equitably estopped from claiming rental for the second month.

We agree with the court below in this conclusion. When the motion was called up, on December 6, the Trust Company insisted upon its right to have an immediate surrender of the road, and opposed even a postponement of thirty days. Possession of the road being withheld from them without their assent, they are equitably entitled to rent for this month. But the order entered on January 6, directing the receivers at the expiration of thirty days from that date to surrender possession to a receiver to be appointed by the United States Circuit Court, having been entered by consent of the parties — in other words, the Trust Company having waived the delivery of the road for thirty days, it ought not now to insist upon payment for that period. Indeed, as the receiver of the Omaha Division had not then been appointed, it is difficult to see to whom the road could have been immediately turned over.

As bearing upon the general equities of the case, it may be remarked that, while the proceedings in the foreclosure of the Wabash mortgage did undoubtedly result in the detention of the road from its lawful owners for about fifteen months without the payment of the agreed rent, the road during this time earned nothing beyond its operating expenses, and there

is nothing to indicate that it would have done so in the hands of its owners, so that in fact they lost nothing. Indeed, it is scarcely credible that they would have delayed so long to demand possession of the road if in their opinion it could have been operated at a profit.

The decree of the court below is, therefore,

*Affirmed.*