CENTRAL TRUST CO. v. THIRD AVE. R. R.

PENNSYLVANIA STEEL CO. v. NEW YORK CITY RY. CO. et al.

(Circuit Court, S. D. New York. December 1, 1908.)

1. CORPORATIONS (§ 565*) — INSOLVENCY AND RECEIVERS — CREDITORS' SUITS — PROOF OF CLAIMS.

In the administration by a court of the property of an insolvent corporation, the fact that all of the stock of certain creditor corporations is own-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ed by one of the number does not entitle it to prove claims in behalf of the others, but each must be proved separately.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 565.*]

2. STREET RAILROADS (§ 58*)—LEASES—CONSTRUCTION—SURRENDER OF PROPERTY BY RECEIVERS.

Receivers for a street railroad company, which included in its system several leased lines, within a reasonable time after their appointment elected to surrender one of such lines which they had operated until that time and the rent for which was in default, and the same was turned over to a receiver for the lessor company. The lease provided that all property passing thereunder should be maintained in good repair by the lessee, including all cars and other items of equipment, and on termination of the lease by default or otherwise should be returned, except such as had ceased to exist, as to which the substitutes therefor provided by the lessee, with all increments and additions and all improvements and betterments on the property, should pass to the lessor, which substitutes should be equal in value to the property for which they were substituted. At the time the property was surrendered there was a quantity of coal bought by the receivers for the lessee in the power house of the leased line, for use generally in furnishing power for the system. This could have been removed, but by agreement was turned over to and accepted by the receiver for the lessor without prejudice to the rights of either party. There were also other items, such as oil and repair parts, adapted for use generally on the different lines and bought for that purpose with general funds of the receivership, stored on the leased property, as well as repair parts adapted for use only on the special design of machinery in use in the power house of the leased line. *Held*, that such of the latter class of items as were bought by the lessee before the receivership had been so appropriated to use on the leased line as substitutes for worn-out parts as to pass to the lessor under the terms of the lease, but that as to the coal and general repair parts there was no such appropriation, and the receivers for the lessee were entitled to recover for the same.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. § 58.*]

In Equity. On application for adjustment of certain claims presented by and against receivers for the respective companies.

Bowers & Sands, for Central Trust Co.

Evarts, Choate & Shearman, for receiver of Third Ave. R. R.

Byrne & Cutcheon, for Pennsylvania Steel Co.

Dexter, Osborn & Flemming, for receiver of New York City Ry. Co.

Masten & Nichols, for receivers of Metropolitan St. Ry. Co.

LACOMBE, Circuit Judge. The first claim to be considered is presented by the receiver of the Third Avenue Railroad.

That road was taken possession of by the Metropolitan Company under lease dated April 13, 1900, and subsequently came into possession of the New York City Company, as sublessee, under a lease from the Metropolitan dated February 14, 1902. Upon default in payment of stipulated rental—in the shape of interest due on mortgage bonds of the Third Avenue which lessee covenanted to pay—the mortgage trustee began suit to foreclose, and the receiver therein took possession of that road.

The lease of 1890, like other leases of street surface railroads which have been recently considered by this court, contained careful provi-

sions for the preservation and maintenance of the leased property. The lessee agreed to "maintain, manage, use and operate and keep in good and working order, condition and repair, at its own expense, the entire line of the said demised railroad or railroads; and all extensions and branches thereof which are now or may hereafter be constructed, and all fixtures and appurtenances thereof, which now are, or hereafter may be constructed; and also keep the personalty hereby demised in good working order, condition and repair, so that the traffic and business of said railroad shall be encouraged and developed and reasonable accommodation given to the public." The lessee further agreed that it would "deliver up said railroad or railroads and all buildings, fixtures and appurtenances at the expiration of the lease or whenever the same shall become inoperative, in good order and repair," and that it would "at the termination of this lease or when for any cause it may cease to be operative, transfer, deliver and return to the party of the first part in good condition, the horses, harnesses, cars, tools, implements, machinery, equipments, stable equipments, office furniture and fixtures, and all property of every kind leased to and used by the party of the second part in the maintenance and operation of the railroad or railroads aforesaid, except that which is hereby absolutely transferred to the lessee (namely the stocks and bonds then owned by the lessor) or which has passed from existence by death or destruction or other cause, and shall also deliver the substitutes, increments and additions provided or made by the party of the second part; and the substitutes for the property impossible to deliver by reason of death or destruction shall be equal in value to that for which they are substituted." The lease also provided "that in case of default in the payment of the rent as aforesaid, or failure of the party of the second part to comply with all or any of the terms of this lease, and such default shall continue for a period of six months, the party of the first part shall have the right to re-enter and re-possess all the demised property, together with the improvements and betterments thereon or thereto appertaining, which right shall not lapse or cease to exist on account of any waiver or condonation of another prior default by implication or agreement, and such re-entry shall not impair the claims of the party of the first part for lawful damages for any defaults of the party of the second part."

When the receiver of the Third Avenue took possession the road, its cars and equipments were in a condition of great disrepair, much of the personal property originally transferred had been used up or had otherwise disappeared and no renewals or substitutes had been supplied to take its place. An examination of the general items of the claim presented discloses its character. We find such charges as "repairs to cars, track and buildings," "constructing and operating stores and supplies," "unpaid franchise taxes," etc. Manifestly the claim is against lessee and sublessee for damages for waste and broken covenants, and in the brief it is stated that counsel believe the Third Avenue has claims which can be asserted against the Metropolitan and New York City Companies, and that he does not ask leave to assert these claims against the receivers of these companies.

There is no reason apparent why the court should itself examine

into these claims in the first instance. The usual practice is to refer them to the special master for investigation and report, and it is understood that this is what petitioner asks leave to do. That application is granted.

It is noted, however, that certain claims in favor of the Forty-Second Street Company, the Dry Dock Company, and the Union Railway are included in the enumeration. These are independent roads, and their legal position is not changed by the fact that the Third Avenue owns the whole or a part of their capital stock. The circumstance that the same individual is the receiver of all four roads is immaterial. Each road has an independent claim, which must be presented and prosecuted independently.

2. The next claim belongs in a different category. It is asserted against receivers of New York City and Metropolitan, as officers of the court.

These receivers took possession of the Third Avenue Road under order of this court on September 24, 1907, and retained possession until on January 11, 1908, it was turned over to the receiver of that road, who had been appointed about a week before. No compensation for the use and occupation of the property during that period has been paid to the Third Avenue or its receiver. As early as October 8, 1907, a memorandum was filed (157 Fed. 443) indicating that the New York City receivers were examining the books to see if the contract (original lease) was or was not one which they should elect to accept. There was no unreasonable delay in conducting that examination, which ended in an election not to accept the contract. See memoranda of December 13, 1907 (160 Fed. 221), and January 4, 1908 (158 Fed. 460). No one could possibly have been misled into the belief that the receivers had agreed or expected to agree to be bound by the covenants of the lease. Under these circumstances they cannot be required to compensate for their use and occupation by the payment of a sum which is the equivalent of the rent stipulated in the lease. See opinion filed October 19, 1908, on petition of Belt Line. 165 Fed. 489. So much is clear. It is further contended, however, that these receivers are under no obligation to pay for the use and occupation of the property during the time they were experimenting with it to see if it were profitable or unprofitable, or at least during some part of that time, i. e., subsequent to October 13th, when the first default occurred. See U. S. Trust Co. v. Wabash R. R., 150 U. S. 287, 14 Sup. Ct. 86, 37 L. Ed. 1085; Oak Pitts Colliery Co., 21 Ch. Div. 322; Quincy R. R. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, 36 L. Ed. 632. The court is not inclined, as a matter of first impression, to assent to this proposition, but, like all such questions which depend on a presentation of many facts and circumstances and concerning which there is much judicial literature, it may more appropriately be reserved for consideration when the master's report is filed. This claim is therefore sent to the special master with instructions to take testimony and report whether any net profit, and, if so how much, accrued to the New York City receivers from the operation of the road during the entire period from September 24, 1907, to January 11, 1908; and, if asked to do so by either party, he will similarly report as to

portions of that period.   He will also report the facts, with his opinion, as to the liability generally of the occupying receivers to account for net profits accrued during such period, or any part of it.

It should be noted in advance that manifestly there can now be made no exact determination as to net profits.   A proper item of charge against gross receipts is the amount the operating receivers have paid, or have incurred liability to pay, for damages resulting from accidents happening during their operation of the road.   Until the statute of limitations shall have run, no one can tell how large a sum is claimed for such damages, much less how much must be paid to the injured parties.   It is suggested, however, that on the accounting some basis of adjustment may be reached by averaging past experiences with the same property, or that ample security may be offered and accepted to cover future damage claims.   Whether or not some such arrangement can be made is a matter which may be discussed, and, it is hoped, disposed of before the master.

Inasmuch as this claim is asserted not against the companies, but against receivers as officers of the court, the special master will give it a preference in trial and disposition over other claims before him.

3.  The next group of claims is presented by the present receiver of the New York City Railway, succeeding to the rights of the original receivers of that road, against the receiver of the Third Avenue, for various items of personal property which it is asserted belonged to the New York City Company or to its receivers, and which were by them supplied to the latter receiver when he began to operate the Third Avenue road, it being more convenient for all parties to have him take this property (then on the premises) from them at a fair price than to buy it in the open market.   The property consisted of coal and various supplies needed for the operation or repair of the road and its equipments.   None of this property had been affixed to the realty nor to any personalty that was so affixed, and all of said personal property could have been physically removed from the premises where the same was without disturbing the buildings in which the same then was, or the fixtures therein.   Nor was any of it actually put to use on the cars or in carrying on the work of operation.   The receiver of the Third Avenue relies upon the clauses of the lease of April 13, 1890, quoted above, and insists that when these various items—coal, oil, waste, curbs, valves, bolts, iron, steel, and brass of different dimensions etc., etc.—were bought and paid for by the New York City (or Metropolitan) or its receivers, and placed in the Kingsbridge power plant or the Sixty-Fifth street yard, it became the property of the Third Avenue Company.

By stipulation the value of all the items has been agreed to.   It is also agreed that certain items of iron and steel, aggregating $179.78, belonged to the Third Avenue Company when the lease of 1900 went into effect, and the claim for their value has been withdrawn.   Certain so-called marginal strips are found to be obsolete, and are to be returned to the receiver of the New York City Company.

The principal item is coal; hard coal, 13,065 and odd tons, valued at $29,397.97, and soft coal, 332 and odd tons, valued at $1,073.27.

All of this on January 11th was on the plant of the Kingsbridge power house, a small lot of it being in barge at the dock. How much coal was on hand there on September 24, 1907, does not appear, nor what was the daily consumption; but, since it is agreed that between that date and January 12th the receivers bought and placed upwards of 31,962 tons in the bunkers, and the plant was furnishing continually a large amount of power, it may reasonably be assumed that the amount of coal consumed there in the interim exceeded the amount on hand on September 24th. It should be noted that this claim is not against lessees for any breach of covenant in failing to keep up coal supplies, but against receivers who never accepted the lease nor its covenants.

The amount in the plant, January 11th, was as stated above. A few days prior thereto the Third Avenue receiver, who had been appointed January 6th, and receivers of the New York City Railway met in the chambers of the court to arrange for transfer of the road. No overruling necessity required the transfer to be made one week after appointment; it could quite as well have been made in two weeks, or even in three. The road was being run so as to render efficient public service by the old receivers, who could have continued to do so for an additional period; and in the interim they could have removed their own property from the premises, and the new receiver could have bought and secured delivery of all the coal he needed to begin operation of the road. But it would have been a foolish and unnecessary expense to have hauled thousands of tons of suitable coal away and hauled in other thousands in its place. Therefore it was arranged that everything there at midnight of January 11th should be turned over at the same time as the real estate, fixtures, and rolling stock, but without in any way affecting the rights and interests of the parties. Whatever was the property of the Third Avenue would be received without any obligation to account for it; whatever was the property of the New York City receivers, turned over for the accommodation of the new receiver, he would pay fair value for.

The sole question is, Who owned the 13,397 and odd tons of coal on January 11th? As we have seen, it is reasonable to assume that the great bulk of it had been bought by receivers, but the situation would not be changed by the circumstance that a considerable part of it had been bought by the New York City Company. It was bought by the operators of the whole system, and paid for out of their general funds. When bought and paid for, it was their property. If it had been discovered after purchase and delivery that the coal, although up to sample, was not as well adapted for generating power as some other variety, it could have been resold and other coal bought. The circumstance that it was stored on land belonging to the Third Avenue Company is immaterial; the lessee could use the premises to store its own property or that of other leased lines without thereby transferring title. Nor is it material that the purchaser of the coal (whether company or receivers) intended to burn it up in the Kingsbridge furnaces. Such consumption would be for the general uses of the system. At that time the Kingsbridge power plant supplied power to two substations at 116th street and 129th street. These transmitted power

to: Third Avenue, from 110th street to 130th street; 125th street, from East River through Manhattan street to North River; Amsterdam avenue, from 125th street to Ft. George; Kingsbridge road, from 165th street to Kingsbridge (these were Third Avenue lines). Second avenue, from 116th street to 128th street; Lexington avenue, from 106th street to 130th street; Madison avenue, from 99th street to 135th street to Lenox; 116th street, from East River to Manhattan avenue to 109th street; Lenox avenue, from 116th street to 145th street; Eighth avenue, from Eighty-Sixth street to McComb's Dam; Columbus avenue, from Eighty-Sixth street to 109th street; Amsterdam avenue, from Eighty-Sixth street to 125th street (these were Metropolitan lines). Broadway, from Eighty-Sixth street to Manhattan street. This was the independent line of Forty-Second street, Manhattanville & St. Nicholas Company, to which power was sold. Besides these lines on Manhattan Island, power generated at Kingsbridge was sold also to the Union Railway, the Westchester Electric Railroad, and the Yonkers Railroad, all of which roads were operated independently.

Manifestly the larger amount of power from the Kingsbridge plant was being supplied to lines not belonging to the Third Avenue Company, and it is difficult to see how intent to use coal, bought with general funds, in getting power in that plant, could operate to transfer the title to the coal thus bought specifically to the Third Avenue Company.

Other items of the kind above enumerated, iron, steel, brass, oil, curbs, etc., etc., aggregating in value $12,300.97, were adapted for use generally on the different lines of the New York City Company. The argument as to the coal applies with equal force to them. They were bought with general funds for general uses; they were stored for convenience on Third Avenue property. In the Sixty-Fifth street yard they were practically as conveniently placed for use on Lexington or on Second avenue as on Third avenue. They had never been appropriated to any special use or purpose. For them and for the coal the Third Avenue receiver should pay; had they not been supplied to him by the New York receivers, he would have had to buy them elsewhere.

There is another group of items aggregating $6,594.20. As to these the stipulation states:

"The motors, dynamos and other electrical machinery and apparatus for the generation and distribution of electricity upon said Kingsbridge property was of the Westinghouse design, manufactured by the Westinghouse Electric & Manufacturing Company. All other motors, dynamos and electrical machinery and apparatus for the generation and distribution of electricity in the system of the Metropolitan Company or New York City Railway Company were and are of the General Electric design, manufactured by the General Electric Company. These two designs differ greatly in structure and few of the parts of one can be used on the other. In the construction of the Kingsbridge plant certain modifications were made in the Standard Westinghouse design, so that new or extra parts for such modifications must be specially constructed. The steam plant at the Kingsbridge plant differs in some respects from the steam plant of the Metropolitan Company, and these parts of the Kingsbridge plant cannot be used on the steam plant of the Metropolitan Company."

It does not appear whether these items were bought before or after September 24, 1907. Counsel for the New York City receiver submit

abundant authority that, under the general principles of law as to fixtures, title would not pass from the purchasing lessee to his lessor by mere intent to use.    But under the peculiar language of this lease, the court is of the opinion that such of the items as were purchased by the New York City Company before September 24, 1907, were so appropriated to the Third Avenue road as substitutes for worn-out parts that the receivers of the former road could not hold them against the claim of the latter road or its receiver.    If receiver of the New York City Company feels confident that he can show that some of these parts were bought by his predecessors in receivership, he may do so before the master.    Any so bought by a party not bound by the covenants of the lease would be classified with the other items above disposed of.

As to so much of the claim as is here determined, there is no reason why payment should be postponed till a decision on the claim for use and occupation.    It may take a long time to dispose of that claim, and, when it is disposed of and all charges against receipts allowed, it may be that nothing will be found to be due.    It is not necessary to safeguard the Third Avenue receivership by reserving its obligations for a counterclaim.    Whatever is found to be due for use and occupation will be a charge against the court's officers for which the corpus of the property will respond, and, in the event of a sale, a lien to secure such response will be reserved.