Roland ROTH, Plaintiff-Respondent,

v.

Anna ROTH, G. H. Walker & Co., a partnership, Mercantile Trust Company National Association, Union Electric Company, Manufacturers Hanover Trust Co., Fidelity Fund, Inc., Puritan Fund, Inc., the National Shawmut Bank of Boston, Broad Street Investing Corporation, Irving Trust Company, and Union Service Corporation, Defendants-Appellants.

Nos. 38789, 38794.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Aug. 1, 1978.

Motion for Rehearings and/or Transfer to Supreme Court Denied Sept. 15, 1978.

Application to Transfer Denied
Nov. 6, 1978.

---

Francis A. Casserly, Biggs, Casserly, Barnes, Fickie & Wolf, Clayton, for defendant-appellant Anna Roth.

Coburn, Croft, Shepherd, Herzog & Putzell, Joseph R. Soraghan, Thomas H. Rost, St. Louis, for defendant-appellant G. H. Walker & Co.

Campbell & Campbell, P. C., David L. Campbell, Clayton, Sommers & Holloran, Inc., Don B. Sommers, St. Louis, for plaintiff-respondent.

SNYDER, Judge.

This equity action arises out of an unfortunate family dispute between Roland Lee Roth (Roland) who sued his mother Anna Roth (Anna), G. H. Walker & Company (Walker), a partnership, and others to establish a constructive trust and to recover his share of the value of certain bank certificates of deposit and shares of stock. Walker is a stockbroker, a dealer in investment securities. There was a judgment: (1) in favor of Roland and against Anna in the amount of $5,750.00 principal and $3,077.00 interest for conversion of savings certificates; (2) in favor of Roland and against both Anna and Walker in the amount of $13,992.63 principal and $4,102.28 in dividends for conversion of shares of corporate stock; (3) in favor of Anna and against Walker on a cross-claim filed by Walker; and (4) in favor of Roland and against both Anna and Walker in the amount of $6,740.00 for attorney's fees. Anna and Walker appeal from the judgments in favor of Roland and Walker appeals from the judgment rendered against it on its cross-claim.

Roland has filed a motion to dismiss the appeals of both Anna and Walker for noncompliance with the rules and for damages for vexatious appeal. The motion characterizes the appeals as frivolous. The briefs filed by both appellants do not comply strictly with the rules as to the statement of the points relied on, but the appeals are not frivolous. Instead, they indicate a good faith effort to set forth claims of error believed by the appellants to support a reversal. Certain defective points relied on will be considered and discussed in subsequent paragraphs. The motion to dismiss the appeals is denied.

Roland Lee Roth was 24 years old in 1956 when he was discharged from the armed services. He lived with his parents, Arnold Roth and Anna Roth, until the death of his father April 14, 1961. During that time he turned his entire paycheck over to his mother who used it, along with the father's earnings and other money coming to the household, for living expenses and investments. She gave Roland whatever sums he needed for clothing, recreation and other expenses. Roland worked at the Fisher body plant of the General Motors Corporation when work was available there but in

the years before his father's death he was laid off from time to time and found work at other establishments.

Prior to Arnold Roth's death, he and his wife invested funds in stocks and bank accounts, all of which were held in their names as tenants by the entirety or as joint tenants with the right of survivorship. After Arnold's death, Anna had the shares transferred to the joint names of herself and her son, Roland, as joint tenants with the right of survivorship.

Roland worked steadily at the Fisher body plant of the General Motors Corporation after 1961 and continued to turn over his paycheck to his mother until September 20, 1967 when he left his mother's house to be married. Anna had other income by way of social security, dividends and interest and $10 weekly from a boarder. From time to time after her husband's death and until 1963, Anna obtained casual employment with various employers. From 1963 to 1967 she was unemployed. Anna received insurance payments upon her husband's death but there was no evidence of the exact amounts.

Anna continued to give Roland money for clothes, recreation and other expenses. She also paid household expenses out of the proceeds of his check and Roland testified that the money left over after all expenses were paid was used for investments. Roland declared his mother as a dependent on his tax returns. Neither party kept any accounting of contributions, expenses or amounts invested. They enjoyed a steady income and managed to save enough to invest in stocks and savings certificates, all of which were put in the names of Anna and Roland as joint tenants with the right of survivorship.

Anna took a more active role in the control of the stocks and their investment planning than did Roland. The stock certificates were kept in a safe-deposit box which was in Anna's name. The broker at G. H. Walker & Company, Joseph W. McCormack, testified that Anna called him to discuss the brokerage account and give him instructions. He could not recall whether Roland had ever telephoned him with instructions on transactions. Anna and Roland went down to the broker's office together when investments were made and papers needed to be signed and Roland always helped to decide what investments to make. No joint tenancy agreement was ever filed for their account with Walker. Such an agreement allows either joint tenant to act on behalf of the other.

In September of 1967, Roland and his mother had an argument over Roland's plans to marry and Roland left home. Within the next few days, Anna went to Mr. McCormack at Walker and told him she wanted to transfer all of the stocks out of the joint tenancy and into her name alone. Mr. McCormack told her she would have to obtain Roland's signature on the necessary stock powers and on a letter of instruction before he could accomplish the transfer. He gave Anna the necessary forms and she later returned the stock powers and the letter of instruction signed by her and containing signatures Anna said were Roland's.

Without any attempt to contact Roland to confirm his assent to the destruction of his interest in the shares, or to ascertain that this was, indeed, his signature, Mr. McCormack guaranteed the genuineness of the signatures. In reliance on this guarantee, the issuers transferred all the shares into Anna's name.

William Storer, a qualified handwriting expert, testified unequivocally that Roland's signatures on the stock powers and letter of instruction were forged by whoever signed the name "Anna Roth". Anna admitted that she signed her name to the documents.

Similarly, two of three certificates of deposit from Mercantile Bank were presented for reissue endorsed by Anna and purportedly endorsed by Roland. They were reissued in Anna's name alone on the basis of these endorsements. The signatures on two of the certificates of deposit were forgeries, according to the expert witness, and were placed on the documents by the same person who signed the name "Anna Roth". Roland in 1966 endorsed the other certifi-

cate of deposit which was in the face amount of $10,000, but he signed it only for the purpose of allowing it to be deposited as collateral for a home improvement loan for his mother's house. It, too, was transferred to Anna's name alone upon Anna's request and without Roland's knowledge. Roland testified that he signed the one $10,000 certificate but denied that he signed the stock powers, the letter of instruction or the other two certificates of deposit.

The following shares of stock and certificates of deposit are in question:

| | Value at Date of Transfer to Anna Roth |
| --- | --- |
| 353 shares Puritan Fund | $ 4,115.98 |
| 500 shares Fidelity Fund | 10,150.00 |
| 210 shares Union Electric | 4,912.90 |
| 549 shares Broad Street | 8,844.39 |
| Savings Certificate #15136 (face value) | 10,000.00 |
| Savings Certificate #25872 (face value) | 1,000.00 |
| Savings Certificate #27253 (face value) | 500.00 |

The dividends paid on the shares after the transfer to Anna totaled $8,234.03.

Roland brought suit against Anna, Walker and certain corporate defendants in four counts, the first alleging a constructive trust and asking for certain equitable relief including a decree that one-half of the assets of the trust estate be distributed to him. The second count alleged that one-half of the assets were the property of Roland and that Anna had converted them to her own use and prayed for a money judgment against Anna. The third count for a money judgment against Walker alleged negligence and breach of fiduciary relationship. The defendants in count four were various corporations which issued the stock certificates in question.

Defendant Walker cross-claimed against Anna for the amount of any judgment which might be rendered against it, claiming that any liability incurred by Walker was the direct and proximate result of the misrepresentation by Anna of the genuineness of Roland's signatures.

■ The standard of review of an appellate court in suits of an equitable nature has been set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976) in which the supreme court cut through the confusion that had previously existed as to the appellate review of suits of an equitable nature. The court construed Rule 73.01 to mean that "the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." The court said further, "Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong."

Contrary to the argument of Walker in its brief, the standard of review mandated in *Murphy* is applicable to both court tried law cases and equity cases. The philosophy of appellate review does not differ from the *Murphy* standard in equity cases and if there is substantial evidence to support it, the trial court's judgment must be affirmed. The cases cited by Walker to support a more liberal standard in equity cases were decided prior to *Murphy*.

■ Where the trial court has made no findings of fact or conclusions of law, none having been requested, all fact issues will be deemed found in accordance with the result reached and the judgment will be affirmed if it is correct on any reasonable theory supported by the evidence. *Hoefel v. Hoefel*, 533 S.W.2d 704 (Mo.App.1976); *Corley v. Kiser*, 556 S.W.2d 218 (Mo.App. 1977); Rule 73.01(1)(b).

Appellant Anna Roth relies on five points in her brief including one relating to attorney's fees awarded by the court.

■ Her claim of error in which she maintains that the court should have ordered a surrender of certificates for reissue instead of rendering a money judgment is not preserved for review because it does not comply with Rule 84.04 in that it states only that the court erred without stating wherein and why.

The other three specifications of error resolve themselves into a charge that the judgment of the trial court was against the

weight of the evidence in finding: (1) that Roland's signatures were forged; and (2) that Roland was entitled to a half interest in the certificates of deposit and shares of stock.

The evidence as to forgery was conflicting. Anna testified that Roland signed the documents and a witness who had boarded with her for a number of years testified that he saw Roland signing some papers in the kitchen in Anna's house. The boarder admitted that he did not know the nature of the papers he saw. Roland denied ever signing the stock powers and letter of instruction or endorsing two of the certificates of deposit. A handwriting expert testified unequivocally that the signatures appearing on the stock powers, the letter of instruction and the two certificates of deposit were forgeries. The expert also testified that whoever signed "Anna Roth" to the questioned documents also signed Roland's name. Anna admitted that she signed her name to these documents. The handwriting expert's testimony was not challenged.

In such a situation, we 'heed the well fixed principle that in court tried cases where the evidence conflicts sharply, appellate courts resolve the conflict by according due deference to the trial court because of its superior opportunity "to observe the conduct and demeanor of the parties and their witnesses and to weigh, evaluate and assess their testimony" ' [*Pittman v. Great American Life Insurance Co.*, 512 S.W.2d 857, 861–862[7] (Mo.App.1974)], and because the trial judge has leave to disbelieve all the testimony of any witness [*Southwestern Bell Tel. Co. v. Crown Insurance Co.*, 416 S.W.2d 705, 711[6] (Mo.App.1967)] or to believe part of a witness' testimony and reject the rest. *North Side Finance Co. v. Sparr*, 78 S.W.2d 892, 894[4] (Mo.App. 1935).

*Long v. Lincoln*, 528 S.W.2d 512, 513[3] (Mo.App.1975). These principles compel rejection of Anna's contention that the finding that Roland's signatures were forgeries is against the weight of the evidence.

There was substantial evidence to support a finding that Anna Roth forged Roland's signature on the questioned documents.

Two issues must be considered in deciding whether Roland was entitled to a one-half interest in the assets in question. First, was Roland's contribution to the funds of the family sufficient to support a finding of fifty percent ownership? Second, if evidence of Roland's contribution to the family funds over the years was not sufficient to support the court's finding in his favor, was there a gift by Anna to Roland when she placed the certificates in his name and hers as joint tenants with the right of survivorship?

Bearing in mind that the power of an appellate court to set aside a judgment on the ground that it is against the weight of the evidence should be exercised with caution and only when there is a firm belief that the judgment is wrong [*Murphy v. Carron, supra; Mitchell v. Atherton*, 563 S.W.2d 13 (Mo. banc 1978)], we cannot say that there was such a paucity of evidence as to justify a holding that the trial court erred.

The fact that Roland contributed his entire income to the family fund from the time he returned from the service in 1956 to the time he left home in 1967 is evidence of a substantial·contribution on his part to the family savings and investments. It is only natural that in a family situation such as this no books would be kept and no detailed records made of the amounts spent by Roland for his personal needs and hence, the amounts contributed by him for the support of his parents. Any amounts paid over to his mother for family purposes over and above his personal expenses were a contribution by him to the investment program because he was an adult during this entire period and had no legal duty to provide support for his parents. *Howlett v. Social Security Commission*, 347 Mo. 784, 149 S.W.2d 806 (1941); *Thornsberry v. State Dept. of Public Health and Welfare*, 365 Mo. 1217, 295 S.W.2d 372 (1956). Therefore, the excess of his contributions over his expenses, whatever the amount was, went

into the investments. According to the record, all of the shares of stock were purchased or acquired subsequent to March 13, 1960. The certificates of deposit in question were dated in 1966. Anna testified that her husband earned "plenty" of money and received "plenty" of money from General Motors for his suggestions. She also testified that Roland "got plenty of money" from her. Her testimony was barren, however, of any actual dollar amounts earned or spent. There were some insurance benefits but the record again does not tell us the amount.

In fact, an inference can be drawn that in the years from 1961 to 1967, after the death of his father, Roland was the only contributor to the investments since his mother's income was limited during that time. She received monthly social security payments of between $125 and $150, interest and dividend income from the investments and rent payments from a boarder of $10 per week. The evidence as to her employment was indefinite but apparently she worked only intermittently from 1961 to 1963. The record does not show exactly when nor does it show any amounts that she earned. She was unemployed from 1963 to 1967.

The evidence is clear that Roland made substantial contributions to the investment program of the family during the eleven years after he left the service, even though the exact amount of his contributions cannot be determined.

Did Anna, when she placed the shares of stock and the certificates of deposit in joint names with Roland, make a gift of an interest to Roland over and above his contribution? The shares in question can be separated into two classes. The following shares were originally held in the names of Anna Roth and Arnold Roth and were transferred to the joint names of Anna and Roland after Arnold's death:

> 200 shares General Motors Corporation
> 50 shares Union Electric Company
> 100 shares Fidelity Fund

The remaining disputed shares were originally issued in the names of Anna and Roland. They were:

> 353 shares Puritan Fund
> 400 shares Fidelity Fund
> 160 shares Union Electric
> 549 shares Broad Street

The General Motors Corporation shares were sold and the proceeds used to purchase the $10,000 certificate of deposit at Mercantile Bank which, along with the other two certificates of deposit, was originally issued in the joint names of Anna and Roland.

It is readily apparent that only a portion of the shares could be the subject of a "gift" to Roland from Anna. A substantial fraction of the shares were originally purchased by and issued to Anna and Roland jointly, although fifty of Anna and Roland's Union Electric shares were issued as a result of a stock split of the fifty shares first held in the names of Anna and Arnold, and a small number of Anna and Roland's Fidelity Fund shares were attributable to capital gains distributions on the 100 Fidelity Fund shares first held in the names of Anna and Arnold.

There was substantial evidence to support a finding that Roland's contributions helped purchase all of the disputed assets, but particularly those purchased after Arnold's death. There was also substantial evidence of a gift from Anna to Roland, assuming arguendo that Roland's contributions did not amount to fifty percent of the value of the investments.

The essential elements of a gift are: (1) a present intention on the part of the donor to make a gift; (2) delivery of the property by the donor to the donee; and (3) acceptance by the donee whose interest takes effect immediately and absolutely. *Wantuck v. United Savings and Loan Association*, 461 S.W.2d 692 (Mo. banc 1971) [overruled on another ground in *In re Estate of LaGarce*, 487 S.W.2d 493 (Mo. banc 1972)]; *Firestone v. Yoffie*, 494 S.W.2d 394 (Mo.App.1973).

In *Firestone*, the court found a completed intervivos gift from a father to his daughter saying, at page 398:

Although there are some decisions to the contrary, the great weight of au-

thority is to the effect, and the later decisions hold, that there is a completed gift of corporate shares when by direction of the owner they are transferred to the donee on the books of the corporation and new certificates are issued in the name of the donee . . . even though the certificates so issued are retained by the donor and not delivered to the donee (cites omitted).

The court in *Firestone* also notes, at page 399: "In the case of a transfer of stock to children or to persons considered 'almost as children', *Wahl, supra,* [*Wahl v. Wahl,* 357 Mo. 89], 206 S.W.2d 334 at 338, the law will raise a presumption of a gift from parent to child where it would not be presumed between strangers (cites omitted)."

██ Two elements are of the greatest importance in determination of donative intent: (1) transfer of ownership into the donee's name on the corporation's books; and (2) the existence of a parent-child relationship. Both elements are present here. The transfer to Roland from his mother made him a joint tenant instead of sole owner but there was a transfer of ownership to the extent of the joint tenancy.

In accord with this result is *Wahl v. Wahl,* 357 Mo. 89, 206 S.W.2d 334 (1947). There the donor had stock transferred on the books of the corporation to show himself as a life tenant and the donees as remaindermen. It was held that the transfer consummated an irrevocable gift of a remainder interest to the donees, whose estate therein was vested, with only the enjoyment thereof postponed. Similarly, the transfer on the books to a joint tenancy, or the purchase as joint tenants, evidences donative intent on Anna's part.

██ The only evidence rebutting donative intent is the testimony of Anna who said that she did not believe in wills and that she put Roland's name on the certificates so that they would pass to him on her death. Clearly, the trial court chose to reject her testimony because she lacked credibility as a witness. That issue was for the trial court to decide. *Dickey v. Johnson,* 532 S.W.2d 487 (Mo.App.1975). The

trial court has leave to disbelieve all the testimony of any witness or to believe part and reject the rest. *Corley v. Kiser, supra.* Given the form of ownership and the presumption raised by the parent-child relationship, we cannot say the trial court's implicit finding of donative intent is not supported by substantial evidence, or that it misapplies or misinterprets the law.

██ The fact that there was no delivery of the shares because they were kept in the safe-deposit box does not rebut the contention that there was a gift. The case law is clearly to the contrary to this assertion. In *Firestone, supra,* the court held that there need not be a physical delivery but that constructive delivery is sufficient. There are many cases abrogating the requirement of delivery as between parent and child. *Wantuck, supra,* at page 695, footnote 4.

Anna's relinquishment of dominion over the shares was recognized by Walker when it required Roland's authorization before the shares could be transferred. She could not act without Roland's approval. She had put it out of her power to repossess the shares. *Firestone, supra,* at 400[8, 9]. Accord, *In re Estate of Wintermann,* 492 S.W.2d 763 (Mo.1973), which also states at page 768, "We approve the rule that less proof is required to show delivery as between parties within the family relationship."

██ The element of acceptance may be presumed here because of the benefit to Roland. "The rule is that acceptance will be presumed when the gift is entirely beneficial to the donee, unless the contrary appears. *Jones v. Jones, supra,* 201 S.W. [557] at 558 (Mo.App.)." *Firestone, supra,* at 400.

██ There was substantial evidence to support a finding that there was a gift of an interest in the shares and certificates which, coupled with his contribution, was sufficient to make Roland a one-half owner of the assets.

The Walker appeal contends that the judgment against it was against the weight of the evidence and it erroneously applied

the law: (1) in that the court failed to recognize that a joint tenant may withdraw all securities from a joint account without liability to the account holder; (2) in holding Walker liable for guaranteeing the alleged signatures of Roland; and (3) in denying the cross-claim of Walker against Anna if the signatures were forged. Error was also claimed in the award of attorney's fees to plaintiff because there was no evidence to support such an award. The first two points will be considered together.

The judgment against Walker was for conversion of the stocks held by Anna and Roland as joint tenants. There is little evidence to support a conversion on the part of Walker but Roland pleaded a breach of trust and fiduciary duty by Walker and the judgment can be supported on that basis. All fact issues may be deemed found in accordance with the result reached and the judgment must be affirmed if it is correct on any reasonable theory supported by the evidence. *Hoefel v. Hoefel, supra.*

The ordinary relationship of a stockbroker to his customer is that of principal and agent. A stockbroker, like any other broker, is under a duty to act in good faith toward his customer, and it is held that the relation between a stockbroker and his customer is a fiduciary one. . .

12 Am.Jur.2d Brokers § 113. The responsibility of a broker "is in the nature of a trust, to be executed for the principal." 12 C.J.S. Brokers § 5.

If a broker does not perform his duty, or is guilty of negligence, misconduct or unskillfulness, he not only becomes liable to his principal for the damages the latter may have sustained, but also forfeits his claim for compensation. He is liable to his principal for all damages which flow naturally from his negligence and which are a direct consequence thereof.

12 Am.Jur.2d Brokers § 96.

The view of the broker-principal relation adopted by Missouri courts is consistent with that expressed in the encyclopedias. It is the duty of a broker to act with the utmost good faith and undivided loyalty in the interest of his principal. *King v. Pruitt,* 365 Mo. 823, 288 S.W.2d 923 (banc 1956). In real estate broker cases, the courts have consistently stated that broker-customer relation is fiduciary and confidential in nature and that the broker's obligations are as exacting as those imposed on a trustee in favor of his beneficiary. *Martin v. Hieken,* 340 S.W.2d 161 (Mo.App. 1960); *Herb Tillman Co. v. Sissel,* 348 S.W.2d 819 (Mo.App.1961).

Included among those duties have been the obligation to keep the customer fully informed of all facts pertinent to transactions in which the broker is representing the principal, to make full disclosure of all facts which materially affect the subject matter of the agency, and to exercise reasonable care and diligence in the performance of his duties. *Acy v. Inland Security Co.,* 287 S.W.2d 347 (Mo.App.1956); *Politte v. Wall,* 256 S.W.2d 283 (Mo.App. 1953); *Herb Tillman Co., supra; Martin v. Hieken, supra; Leuzinger v. Merrill Lynch, Pierce, Fenner & Smith,* 396 S.W.2d 570 (Mo. banc 1965). *Leuzinger* will be discussed in some detail because it sets out the standard of care we must apply.

The plaintiff in *Leuzinger* opened an account at a Merrill Lynch office in the name of her and her husband as joint tenants with a right of survivorship. The two of them later signed a standard account form for joint accounts which included the following language: " 'With respect to our joint account with right of survivorship we confirm that: "1. In all matters pertaining to the account you may act upon orders and instructions from either of us".' "

Plaintiff then instructed Merrill Lynch to purchase certain securities. Her husband gave no instructions or directions in that transaction. Over the next three and one-half years Merrill Lynch handled approximately 100 transactions for this account. With the exception of two transactions which took place shortly after the account was opened, in which plaintiff gave the instructions, all of these transactions were undertaken pursuant to orders from plaintiff's husband.

On December 10, 1962, without any written or unwritten request or authorization by plaintiff, but upon the request of her husband, Merrill Lynch sold all of the securities in the joint account and held $59,000 for the account. Again at the husband's sole request, .Merrill Lynch disbursed the entire $59,000 by a check payable to "North Kansas City State Bank for account of W. C. Leuzinger and Leta M. Leuzinger" and delivered the check to the husband without the consent of plaintiff. The husband presented the check to the bank and requested that it be deposited in the joint checking account. Once the proceeds were credited, the husband, without any consent or authorization by plaintiff, withdrew the funds and appropriated them to his own use. The court held that Merrill Lynch was not liable under these circumstances, assigning three different reasons for its decision.

First, plaintiff had given Merrill Lynch broad general authority to act upon the instructions of one tenant alone by signing the joint tenancy agreement.

Second, the manner in which Merrill Lynch executed plaintiff's husband's instructions was not inconsistent with her interest in the joint account. The check, on its face, showed that the proceeds of the check constituted jointly owned property in which plaintiff had an interest.

Third, the court believed that there was nothing in the facts shown which, under the circumstances, would have aroused the suspicions of an ordinarily careful and diligent stockbroker.

The present case is distinguishable on each of these points, and the opposite result, broker liability on the part of Walker, is indicated.

First, no joint tenancy agreement was signed by the Roths. Walker did not have authority to act on the instructions of one tenant alone. Walker's own witness testified that it was custom and practice for stockbrokers to obtain a joint tenancy agreement.

Second, Walker contributed to a change in the form of ownership from Anna and Roland as joint tenants to Anna alone. In *Leuzinger,* the account was closed but the proceeds transferred by means of a check made out in joint names. In *Leuzinger,* there was no way for the broker to know from the check made out in both names that Mrs. Leuzinger's interest was being destroyed (and as the court points out, it was not destroyed at that time). Here, a change in ownership to Mrs. Roth alone was absolutely inconsistent with Roland's interest in the account, both as to his present and his future interest, and completely destroyed his rights as a joint tenant with the right of survivorship. Roland was deprived of his interest in the stocks while they were under Walker's control.

Third, the facts here should have aroused suspicion on Walker's part. Mr. McCormack had been this family's broker for years. Stocks in this account had always been held in joint tenancy. If there is any value to Mrs. Roth's testimony that the stocks were held in this fashion for probate purposes, Mr. McCormack surely knew of that purpose and realized such an action would destroy Roland's right if his mother died. While Mr. McCormack may not have known of the family dispute which prompted Mrs. Roth's action, such a change in the method of handling the account after years of consistent behavior should have prompted suspicion. Further, this is not a case where 98 out of 100 transactions were conducted by one party alone, as in *Leuzinger.* Roland testified (and we must accept this as consistent with the judgment) that he accompanied his mother to the broker whenever any papers needed to be signed. It is unusual that Roland did so for sales of individual stocks but did not so do when he supposedly agreed to the complete destruction of his interest in the entire account.

The totality of the circumstances here would put a prudent man on notice that perhaps questions should be asked. Here are a mother and son who have dealt with the broker for a number of years. The mother did more of the dealing than the son, some of it over the telephone, but the

son participated in the decisions and both the mother and son visited the broker's office whenever papers were to be signed. During the father's lifetime, Roland visited Walker with his father and mother to transact investment business. After these dealings over a period of twelve years, first with Roland and both parents and then with Roland and his mother, Walker failed to notify Roland. The first time Roland heard of the transfers was after they had all been accomplished. There was no rebuttal to this. There was no evidence on the part of Walker of attempts to communicate with Roland.

It is not customary in the securities business to require endorsements to be made in the presence of the broker. Therefore, the fact alone that the stock powers and transfer instructions were not signed at the Walker office would not constitute a breach of fiduciary duty. But this fact, along with the other circumstances surrounding the transfers, adds to the weight of the evidence of negligence. The failure on the part of Walker to notify Roland, coupled with the forgery and the guarantee of the forged signature without question, was a contributing proximate cause of the transfer of the securities out of Roland's name and the resulting damage to him.

For our purposes, the court's language at page 576 in *Leuzinger* is crucial:

> Pursuant to the general duty of a stockbroker to act in good faith with customers and to make a complete and full disclosure of all material facts concerning a transaction, if the stockbroker knows of facts and circumstances which would lead an ordinarily careful and diligent person to believe that one joint tenant of a joint brokerage account was in the process of wrongfully converting to his own uses and purposes the interest of the other joint tenant, a duty to inform the latter would arise, and in such case the broker would be derelict in disbursing the whole account to the joint tenant under suspicion, without first informing the other and obtaining consent and approval to the disbursement.

Applying this standard, Walker had a duty to inform Roland before transferring the shares. Sending the papers with the party under suspicion does not satisfy that duty. Knowing of facts which should have led an ordinarily careful and diligent broker to believe a conversion might be taking place, Walker was derelict in not communicating with Roland and obtaining his personal consent and approval. Walker breached the fiduciary duty owed Roland as their client.

"If a broker does not perform his duty, or is guilty of negligence, * * * [h]e is liable to his principal for all damages which flow naturally from his negligence and which are a direct consequence thereof." 12 Am.Jur.2d Brokers § 96, *supra.*

The injury to Roland was "the reasonable and probable consequence of the act or omission of the defendant." *Green v. Kahn,* 391 S.W.2d 269 (Mo.1965). It is not necessary that the negligence of the defendant be the sole cause of the injury. It is sufficient that it be one of the efficient causes thereof, without which the injury would not have resulted. *Green, supra.*

Walker places emphasis on the inapplicability of § 400.8–312, RSMo1969 relating to the warranties flowing from the guarantee of an endorsement signature. Section 400.8–312, subparagraph 3, RSMo1969 provides that the warranties "are made to any person taking or dealing with the security in reliance on the guarantee . . . ." Roland did not take or deal with the securities in reliance on the guarantee but they were taken from him by those who relied on the guarantee.

However, Roland's claim is not based on the guarantee but upon the relationship between broker and client and the breach of the duty on the part of Walker to inform Roland that the securities were being transferred to Anna's name alone. It is obvious that the section relating to the guarantees of signatures was made a part of the law to protect subsequent transferees and purchasers, "any person taking or dealing with the security in reliance on the

guarantee." § 400.8–312, RSMo1969. However, the section does not preclude owners or others from pursuing different types of remedies. "Any person against whom the transfer of a security is wrongful for any reason, including his incapacity, may against anyone except the bona fide purchaser . . . have damages." § 400.8–315(1), RSMo1969. It is not necessary that Roland have standing as a claimant under § 400.8–312, RSMo1969 in order for him to recover against Walker. *Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith*, 479 F.2d 478 (6th Cir. 1973) holds that a statute such as § 400.8–312, RSMo1969 does not apply to the owner. However, the court also holds in that case that a statute such as § 400.1–103, RSMo1969 specifically provides that traditional rights and remedies remain in force unless eliminated by a particular provision of the Uniform Commercial Code.

On this authority, Walker's breach of fiduciary duty in failing to observe reasonable commercial standards in dealing with Roland is a fact question which was decided adversely to them. A review of the evidence reveals that determination is supported by substantial evidence and does not misapply or misstate the law.

Walker urges that it was error for the trial court to render a judgment for Anna on Walker's cross-claim for damages. We rule against Walker on this point.

█ Walker argues that because Anna forged Roland's signatures on the transfer documents, that forgery caused a loss to Walker and therefore, Anna should be liable over to it for damages. Walker bases this claim upon § 400.8–306(2) and (5) and § 408.315(1), RSMo1969, sections relating to warranties and wrongful transfer. However, these sections do not apply.

Walker has the rights and privileges of a purchaser under § 400.8–306(5), RSMo1969, but the warranties run to a purchaser for value. A purchaser is one who takes by purchase, § 400.1–201(33), RSMo1969, but not every purchaser is necessarily a purchaser for value. Value is defined in § 400.1–201(44).[1] Obviously here Walker was not a purchaser for value, nor was Anna, and the warranties do not extend to them.

█ The section on wrongful transfer [§ 400.8–315(1), RSMo1969] was included in the Uniform Commercial Code primarily for the benefit of owners of securities. Even assuming that it could be construed to apply to a broker under certain circumstances, Walker here was guilty of negligence and should not be permitted to take advantage of a wrongful transfer statute if its negligence contributed to the wrong.

Neither Anna nor Walker identified this issue as one of indemnity and their briefs do not speak to this point, but the cross-claim is, in fact, a plea for indemnity praying for judgment against Anna in an amount "equal to any amount which defendant Walker is required to pay to plaintiff."

The issue may be stated as follows: Where a stockbroker, in breach of its fiduciary duties negligently allows or aids one joint tenant to commit the wrongful act of conversion against another joint tenant, should the negligent tortfeasor (Walker here) be indemnified by the intentional tortfeasor (Anna)?

Under the case law on indemnification as it stood at the time of the trial of this case, and at the time the appeal was argued, the trial court's denial of Walker's cross-claim for indemnity against Anna would have

---

1. Section 400.1–201(44), RSMo1969 reads as follows:

(44) "Value". Except as otherwise provided with respect to negotiable instruments and bank collections (sections 400.3–303, 400.4–208 and 400.4–209) a person gives "value" for rights if he acquires them

(a) in return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection; or

(b) as security for or in total or partial satisfaction of a pre-existing claim; or

(c) by accepting delivery pursuant to a pre-existing contract for purchase; or

(d) generally, in return for any consideration sufficient to support a simple contract.

been affirmed. Walker's own "active" negligence had been established. Its liability was not derivative nor was it based on "passive" negligence. The parties would have been left to divide the liability on the judgments against them. *State v. McLaughlin*, 315 S.W.2d 499 (Mo.App.1958); *Crouch v. Tourtelot*, 350 S.W.2d 799 (Mo. banc 1961).

Since this case was argued, however, the Missouri Supreme Court has handed down its opinion in *Missouri Pacific Railroad Company v. Whitehead & Kales Company*, 566 S.W.2d 466 (filed April 28, 1978), substantially altering the principles of noncontractual indemnity and contribution as they are applied in Missouri. In *Missouri Pacific* the court abandoned the "active-passive" negligence standard and adopted a system of distribution of joint tort liability based on relative fault. "The two concurrent tortfeasors should be treated according to their respective fault or responsibility." *Missouri Pacific, supra,* 472. This principle of apportionment of liability applies "whether the tortfeasors were joined as defendants by the plaintiff or a third party defendant was added to a cause under our rule 52.11." *Missouri Pacific, supra,* 474.

■ In deciding whether to apply an overruling case prospectively or retrospectively, Missouri courts have adopted a "procedural-substantive" law test. If the overruled decision is one dealing with substantive principles of law, the subsequent overruling decision is retroactive in effect. *Shepherd v. Consumers Cooperative Association*, 384 S.W.2d 635 (Mo. banc 1964).

■ " 'The distinction between substantive law and procedural law is that "substantive law relates to rights and duties which give rise to a cause of action," while procedural law "is the machinery for carrying on the suit." ' " *Shepherd, supra,* 640, quoting *Barker v. St. Louis County,* 340 Mo. 986, 104 S.W.2d 371, 377[10] (1937). Since the ruling in *Missouri Pacific, supra,* affects apportionment of damages and the rights of recovery among joint tortfeasors, it is a change in substantive law. This court is required, therefore, to apply the correct rule of law even though counsel and the trial court could not have been aware of it when the suit was heard. *Skidmore v. Back,* 512 S.W.2d 223 (Mo.App.1974).

■ Under § 512.160(3), RSMo1969, and Rule 84.14, appellate courts have an obligation to dispose finally of a case on appeal unless justice otherwise requires. However, because of the change in the law mandated by *Missouri Pacific, supra,* which was unknown to both the court and litigants when the case was decided in the circuit court, the cause will be remanded for a hearing on the apportionment between Anna and Walker of the liability for the damages awarded in the total amount of $18,094.91 for conversion of the shares of corporate stock. In apportioning the liability for these damages, the trial court shall consider the "principle of fairness," *Missouri Pacific, supra,* 469, and the relative weight of the fault and responsibility of each defendant, casting aside formerly used concepts of "primary and secondary" duty and "active and passive" negligence.

■ Both Anna and Walker allege error on the part of the trial court in its award of attorney's fees to Roland. Unfortunately, neither appellant has complied with Rule 84.04(d) in the briefs submitted. Both briefs, in the points relied on sections, state only that the court erred in awarding attorney's fees without telling this court, or the respondent, wherein and why the court erred. Because this point has not been preserved for review, it is ruled against both appellants. *Greater Missouri Builders v. Blattner,* 555 S.W.2d 648 (Mo.App.1977). The apportionment between Anna and Walker of the liability for the attorney's fees shall be in the same proportions as the respective liabilities of the defendants, taking into consideration both the amount of the judgment against Anna for conversion of the savings certificates and the apportionment of liability between Anna and Walker upon rehearing for conversion of the shares of corporate stock.

No issue has been raised on appeal as to the judgment on count four of the petition

and the cross-claim of the count four defendants.

The judgment is affirmed expect as to the apportionment of liability for the damages for conversion of the corporate shares and the attorney's fees. The cause is remanded for the determination by the trial court of the proportionate liability of each defendant as to these parts of the judgment.

DOWD, P. J., and ALDEN A. STOCKARD, Special Judge, concur.