Joann **WOOD**, Plaintiff-Appellant,

v.

**JACK CARL ASSOCIATES, INC.,** Defendant-Appellee.

No. 85–1822.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1985.
Decided Jan. 15, 1986.

Alan R. Borlack, Meyers, Malk, Harris & Borlack, Chicago, Ill., for plaintiff-appellant.

Steven A. Weiss, Reuben & Proctor, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.[*]

POSNER, Circuit Judge.

The plaintiff, Joann Wood, married Jeffrey S. Prentice on April 8, 1984, and 11 days later they established with the defendant, Jack Carl Associates, Inc., an account for trading commodities futures. Both spouses signed the agreement in the place for customer signatures. A few days later Joann Wood deposited $70,000 of her own money in the account; her husband made no deposit. Jack Carl Associates acknowledged the deposit in a statement of account addressed to "Jeff and Joann Prentice." A few days later Prentice wrote Jack Carl that "For tax purposes—my trading acct. ... should be in my name only.... However, for right of survivorship, ... my wife should receive the acct." This letter was written without the knowledge of his wife. Jack Carl Associates changed the name on the account as directed. The next month, at Prentice's direction, Jack Carl Associates made two disbursements to Prentice, one for $20,000 and the other for $50,000, thus emptying the account. Joann Wood

was not notified. Prentice later absconded with the money. Joann Wood obtained both a judgment for the full amount against Prentice and an annulment of the marriage, but, the judgment being uncollectable, she brought this diversity suit for $70,000 against Jack Carl Associates. The suit charges conversion, and points out that nowhere in the customer agreement is there authorization either to change the name of the account or to pay money out of it without the authorization of all the customers who signed the agreement. The district court, however, dismissed the complaint for failure to state a cause of action, and Mrs. Wood has appealed.

The district court reasoned as follows. At common law, Joann and Jeffrey would be joint tenants, and each therefore would have an undivided right over the whole account and could withdraw the whole thing; and no statute has altered the common law in this respect. Mrs. Wood does not take issue with the district judge's interpretation of the common law. Her argument rather is that the statute made her and her husband tenants in common rather than joint tenants, so that their rights in the account were in proportion to their contributions—which means she owned the whole thing.

The statute, Ill.Rev.Stat. ch. 76, ¶ 2, provides that unless there is a "writing expressing an intention to create a joint tenancy in personal property with the right of survivorship"—and no one construes the customer agreement to be such a writing—"the right or incident of survivorship as between joint tenants or owners of personal property is hereby abolished, and all such joint tenancies or ownerships shall, to all intents and purposes, be deemed tenancies in common," with certain exceptions, of which only one is relevant here, in subparagraph (c):

> When shares of stock, bonds, or other evidences of indebtedness or of interest are or have been issued in the joint

[*] Chief Judge Cummings recused himself after oral argument and has not participated in the consideration or decision of this case.

names of two or more persons or their survivors by corporations, including [state and federal savings and loan associations and credit unions], all payments on account thereof made then or thereafter, redemption, repurchase or withdrawal value or price, accumulations thereon, credits to, profits, dividends, or other rights thereon or accruing thereto may be paid or delivered in whole or in part to any of such persons whether the other person or persons be living or not, and when an agreement permitting such payment or delivery is signed by all said persons at the time when the shares of stock, bonds or evidences of indebtedness or of interest were issued or thereafter, the payment or delivery to any such person, or a receipt or acquittance signed by any such person, to whom any such payment or any such delivery of rights is made, shall be a valid and sufficient release and discharge of any such corporation for the payment or delivery so made....

There is no reported decision construing this provision in a respect pertinent to this case, no published legislative history, and no similarly worded statute in any other state.

The absence of the usual aids to statutory interpretation would be no problem if the statute were clear, but it is not. The problem comes from the words "and when" which introduce the last clause of subparagraph (c). The language before those words, which was the language that the district judge relied on in dismissing the complaint, states as clearly as words can do that when a bank or other financial institution such as a commodities broker issues an evidence of indebtedness in the names of two persons jointly, as it did here when it acknowledged receipt of Mrs. Wood's money, it can thereafter pay all or part of the money to either of the persons named on the demand of that person. There is no statutory authorization to change names on the account, and this could make a difference in another case; but, for reasons which will appear, we shall not have to explore this issue in this case.

Mrs. Wood argues that the first half of subparagraph (c) merely authorizes payment subject to whatever liabilities to the joint owner such payment might impose. But this cannot be right. The laws of nature, not the laws of man, determine the physical capacity of Jack Carl Associates to issue a check to a joint account beneficiary; the only purpose of the statute can be to make that issuance a lawful act. The clause that follows "and when," however, makes payment to one of the beneficiaries operate as a release or discharge of the bank's liability to the other beneficiaries, provided the agreement establishing the account (or some later agreement) authorized payment to one beneficiary without the consent of the other(s), and the agreement here did not. Thus the statute is inconsistent. First it authorizes payment to one joint owner without any formalities, and in the next breath it authorizes the same thing if there is an express writing to that effect.

The statute dates back to 1917. Originally it read:

That if partition be not made between joint tenants, the parts of those who die first shall not accrue to the survivors, ... *provided* that when a deposit in any bank or trust company ... has been made or shall hereafter be made in the names of two or more persons, payable to them, jointly or severally evidenced by a writing signed by them when the account is opened, such deposit or any part thereof or any interest or dividend thereon may be paid to any one of said persons, whether the other or others be living or not; When an agreement permitting such payment is signed by all said persons at the time the account is opened or thereafter and the receipt or acquittance of the person so paid shall be valid and sufficient discharge from all parties to the bank for any payments so made.

1917 Ill. Laws 557–58. This is not a very happily drafted statute, to say the least; in particular there is no main clause to which

the subordinate clause introduced by "When" relates. This grammatical confusion can be eliminated, however, simply by moving "and" from before "the receipt" to before "When"; and that is what the legislature did two years later. See 1919 Ill. Laws 634. Subparagraph (c) of the current statute differs from the 1919 version (so far as material here) only in deleting "payable to them, jointly or severally" in the first clause; it is enough that the account was opened in more than one name.

The idea behind the original statute was evidently to permit a joint tenancy in a bank account provided the depositors had expressly authorized payment to any of them (hence "payable to them, jointly or severally"—we assume the comma was meant to go after "severally" rather than after "them," as "jointly or severally evidenced" makes no sense); the ungrammatical fragment following the semi-colon was designed to emphasize this requirement. Later the legislators discovered that the fragment didn't parse. But in correcting their grammar by moving the word "and" they replaced grammatical with semantic confusion, reinforced by the deletion of "payable to them, jointly or severally" which, though probably motivated simply by the felt redundancy of these words in light of the material following the semi-colon, inadvertently interacted with the movement of "and" to create two completely inconsistent legal standards: an easy one and a tough one.

■ If this reconstruction is right—and it's the best we can do to make sense of the statute—then the statute does indeed require, as Mrs. Wood argues, express authorization for a bank or other financial institution to pay all the money in an account to one of the persons named in the account when there are several. But this does not carry the day for her. We have to consider the intended domain of the statute. The statute sought to regulate survivorship in property in which more than one person has an ownership interest. This had long been a controversial matter; Illinois was one of those states in which the right of

survivorship was thought "productive of injustice because it makes no provision for posterity," an "offensive right," "a relic of the feudal system, and the policy of the American law has always been opposed to it." *Illinois Trust & Savings Bank v. Van Vlack*, 310 Ill. 185, 195, 141 N.E. 546, 549–50 (1923) (dissenting opinion). All this makes little enough sense, and in any event is clearly overborne by the desirability of allowing survivorship in bank accounts and other financial assets so that survivors can get their hands on some cash immediately on death, without the delay, expense, uncertainty, and travail of probate. See Kepner, *The Joint and Survivorship Bank Account—A Concept Without a Name*, 41 Calif.L.Rev. 596, 597 (1953). Hence the proviso in the statute, preserving the right of survivorship in financial assets.

But the statute does not seem addressed to the situation where no right of survivorship is claimed—where the only issue is the financial institution's liability for having paid the money in a joint account to one of the account holders without the express authorization of the others. Additional evidence is the title given the section in the 1919 session laws—"Survivorship rights abolished—proviso as to bank account." Although the statute speaks of payment of the account whether the other joint owner or owners "be living or not," this seems in context to mean only that death makes no difference. The need for the statutory proviso came from the fact that, once the right of survivorship was abolished, the bank would be without any authority to pay over the money in the account to anyone other than the executor or administrator, in whom the death of the account holder would immediately vest his property, including his contract rights against the bank. Perhaps because of hostility to survivorship, the statute can be read, as we have suggested, to require that the bank show that it has express authority to pay the survivor, before it can be released from the claims of beneficiaries and creditors of the estate. But where there is no death, there is no question of the bank's liability for paying a survivor what by operation of

law was actually due to the estate. We are thrown back, it seems, on the common law.

■ Unfortunately Mrs. Wood has made no effort to establish a common law basis for the defendant's liability for having paid out the funds in the account to her dishonest husband. She has staked her all on the applicability of the statute, and has lost the throw. For she does not contest the district court's conclusion that, but for the statute, the contract with Jack Carl Associates created a joint tenancy and her husband as joint tenant could withdraw the entire account. We have our doubts—the implication of the court's reasoning seems to be that not even the husband was guilty of conversion, or at least not guilty to the tune of $70,000, if he really was a joint tenant and hence had an undivided one-half ownership interest in the account—and we might be inclined therefore to give her another chance if we thought there were a clear basis in common law for holding Jack Carl Associates liable for its inadvertent complicity in her husband's scheme to defraud her. But there is not. Go back to the statutory words "living or not"; for all that appears the underlying assumption is that of course a bank can pay out funds in a joint account to anyone on the account if all such persons are living, so that survivorship is not in issue.

For the issue is not, as it may appear to be, joint tenancy versus tenancy in common. These terms define the rights between claimants to property. Jack Carl Associates claims no rights in the $70,000. The issue is the liability of a third party—a bailee or, as here, a financial intermediary—for conduct that may disturb the balance between the claimants. It may well be that the joint account was a tenancy in common rather than a joint tenancy. But that is a matter in the first instance at least between Joann and Jeffrey rather than Joann and Jack Carl Associates. Consider a car owned by two people as tenants in common and kept in a private garage. Assume that the garage owner knows that the car is owned by tenants in common, and what is more, he is a bailee for hire; he

charges for garaging. One of the owners of the car tells the garage owner that he and his friend are moving to another state and want to close out the account. He pays the accumulated garage fees and drives off. Unbeknownst to the garage owner the friend is not moving, and the one who just drove off has converted his friend's interest. The garage owner would not be liable if he had no reason to think that the purpose of removing the car from his custody was otherwise than as represented by one of the owners. And it would make no difference whether the tenancy was joint rather than in common.

*Leuzinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 396 S.W.2d 570 (Mo.1965), is a financial counterpart to our hypothetical garage case. A husband and wife, as here, had a joint account with a securities broker. At the husband's direction the broker liquidated the account and gave him a check payable to a joint bank account that he maintained with his wife. The husband deposited the check and then withdrew the entire amount. The court held that the broker was not liable to the wife for the loss of her joint interest, among other reasons because the broker had had no reason to think that the husband by liquidating the brokerage account was trying to convert his wife's property. See *id.* at 576–77. That was a stronger case for the broker on the facts than this, but in this case the plaintiff does not so much as argue that the broker should have smelled a rat. The broker didn't know—at least Mrs. Wood has never suggested that the broker ever knew—that the $70,000 was her money (she wrote the check for it, but so far as the broker knew the money might have been her husband's), that the reason for changing the name of the account was otherwise than as represented, or that the withdrawal had any motive other than to pursue financial opportunities elsewhere. Commodities speculation is highly risky and customers frequently get cold feet and withdraw, and as far as Jack Carl Associates knew this was all that happened here. In *Roth v. Roth*, 571 S.W.2d 659 (Mo.App.1978), the joint tenant pre-

vailed against the broker, because "the totality of circumstances here would put a prudent man on notice that perhaps questions should be asked," *id.* at 669; there was, in short, negligence, *id.* at 670. Mrs. Wood does not charge Jack Carl Associates with negligence.

Maybe there is some common law theory on which Jack Carl could nevertheless be held liable. Maybe we should read into the customer agreement a bar against the broker's paying one account holder without the other's consent. But we doubt this, and anyway it hasn't been argued to us. The prevalence of joint accounts (especially between spouses) in which any account holder is expressly authorized to withdraw part or all of the funds is evidence that most people who open such accounts think that the inconvenience of requiring two signatures outweighs the risk of fraud. It is true that the account with Jack Carl Associates was not a checking account; but people who trade commodities generally want to be able to move their money rapidly from one account to another in hot pursuit of changing investment opportunities. A rule of the common law which required two signatures unless the owners of a joint account expressly authorized withdrawals on the basis of one might add more to the cost of transacting than to the prevention of fraud, because parties would almost always contract around the rule.

The passage in many states of statutes which unlike Illinois' are clearly intended to give banks and other financial institutions a safe harbor not merely when they pay out on death but whenever they pay out without authorization of all the account holders suggests that in the absence of such legislation the institution might be exposed to liability in a case such as this. There are intimations of such a common law liability (by which we mean strict liability, not the negligence liability discussed earlier and clearly not alleged here) in Story's influential treatise on bailments, see Story, Commentaries on the Law of Bailments 87–89 (1832), and in modern sources as well, but they are remarkably fleeting. See, e.g., Beutel & Schroeder, Bank Offi-

cer's Handbook of Commercial Banking Law 314–16 (5th ed. 1982). A rule of strict liability would overturn our garage hypothetical—a senseless result. We are sympathetic to the law review note writer who said, "In considering the obligations of the bank, one is encountered with surprising lack of authority. In outlining its obligations in a general way, it would seem that the bank has fulfilled its duty when it has acted in entire good faith and used reasonable care." Note, *Banks and Banking: Deposits in the Name of Depositor and Another,* 9 Cornell L.Q. 48, 49 (1923). Compare Note, *Banks and Banking: Joint Bank Deposits: Title of Survivor,* 15 Cornell L.Q. 96 (1929). The case law is indeed sparse, and the only recent case we have found that supports such liability is *Brown v. Bowery Savings Bank,* 51 N.Y.2d 411, 434 N.Y.S.2d 916, 415 N.E.2d 906 (1980), where the joint owner of a savings account filed a new signature card replacing the other joint owner by someone else (without the other joint owner's permission), and the bank made the substitution and was later held liable for paying out the funds in the account to the substituted joint owner. Now as a matter of fact in holding that the common law of New York made the bank liable the court relied on a case that was easily distinguishable, because it involved payment to an imposter, not a joint account holder. See *International Aircraft Trading Co. v. Manufacturers Trust Co.,* 297 N.Y. 285, 79 N.E.2d 249 (1948). But that is a detail. The important thing is that the plaintiff here has made no effort to show that under the common law of Illinois a bank or other financial institution is liable for paying over the whole of a joint account to one of the joint owners even if it does not have express permission to do so, unless it has reason to believe that it is assisting in a scheme to wrong someone; and this, as we have said, is not suggested here.

AFFIRMED.