Imogene HOEFEL, Executrix of the Estate of Hilmar W. Hoefel, Deceased, Plaintiff-Respondent,

v.

Kenneth D. HOEFEL et al., Defendants-Appellants.

No. 36819.

Missouri Court of Appeals, St. Louis District, Division One.

Feb. 10, 1976.

Harvey B. Cox, Jr., St. Louis, for defendants-appellants.

William G. Phillips, St. Louis, for plaintiff-respondent.

WEIER, Presiding Judge.

This is a suit by a father against two sons for restitution of an interest in certain stocks which had been transferred to the sons as joint tenants by the father in 1968. The name of the wife of one of the sons had been added inadvertently to one of the stock certificates, and she was also joined as a defendant. After trial to the court, judgment was rendered that the transfer from the name of plaintiff into the joint names of plaintiff and the defendants as joint tenants with right of survivorship be set aside and plaintiff was declared to be the sole owner of the shares so transferred. The court further ordered that the defendants execute stock powers to transfer their interest in the stock back to plaintiff, and in the event of failure to do so within thirty days their interest would pass by the judgment of the court to the plaintiff. The court retained jurisdiction to carry out its judgment.

After defendants filed their notice of appeal, plaintiff Hilmar W. Hoefel died on January 10, 1975 and Imogene Hoefel, his widow, as executrix of his estate, was substituted as plaintiff-respondent on appeal.

Plaintiff Hilmar W. Hoefel was born June 26, 1905. He married his first wife, Lorraine, on April 7, 1926, and to this marriage two sons were born: Hilmar T. Hoefel, born in 1927, and Kenneth D. Hoefel, born in 1928. They are the only children of plaintiff and both are defendants in this action. From the time of their marriage until 1938, a period of twelve years, Hilmar W. Hoefel and Lorraine operated a bakery business in St. Louis. During this time plaintiff was the baker and Lorraine sold the baked goods to the public and kept books. The two boys, after they became old enough, were given chores to do about the bakery. This business was sold in 1938. Then from 1940 to 1950 plaintiff owned and operated a paper route. The boys would help their father in throwing the papers and plaintiff would drive the truck. When the boys were not available, Lorraine would drive and plaintiff would throw the papers. Lorraine took care of the books and billed the customers. After selling the paper route in 1950, plaintiff was employed at Anheuser-Busch Company and except for an extended period of illness commencing in 1968, worked there from April 12, 1951 until July 1, 1970 when he retired.

Defendant Hilmar T. Hoefel, after attending high school, continued on in college and graduated from St. Louis University with a Bachelor of Science degree in accounting. He worked in the St. Louis area until 1967 and at that time obtained employment in California where he and his wife and family then moved. Defendant Kenneth remained in St. Louis, and at the time of trial was a brewer at Anheuser-Busch where he had been employed since 1948.

Lorraine died of cancer on April 9, 1964. Prior to her death, in 1962, the house on South Kingshighway was transferred into the four names of the father, mother and two sons as joint tenants with right of survivorship. The savings accounts and bank accounts were also placed in all four names as joint tenants. The stocks remained in the names of Hilmar W. and Lorraine Hoefel until after her death, and at that time they were transferred into the name of plaintiff Hilmar W. Hoefel.

After Lorraine's death, Kenneth and his wife, who continued to live in the St. Louis area, were solicitous of plaintiff's welfare and Kenneth in particular stopped by to see his father at his home on frequent occasions. On January 7, 1968, plaintiff was taken to the hospital following an episode of hallucination in which he gave a story of masked men entering his room at 10:00 o'clock in the morning, taking his eyeglasses, hearing aid, and some money, and remaining in his home for a period of four days. He was weak, had a loss of equilibrium, was shaky and nervous. Admittedly at this time he was drinking eight bottles of beer a day. Tests on the electroencephalogram showed a slow brain dysrhythmia, non-focal, non-paroxysmal, which the doctor stated was consistent with a diffuse organic cerebral disorder. This and other tests indicated cerebral impairment which the doctor believed was brought about by generalized arteriosclerosis along with alcoholism. There was an impairment of cerebral functioning which the doctor considered to be chronic. He readily admitted that the condition could improve when a person remained abstinent from alcohol, but where permanent damage had occurred, there would be no improvement. The doctor considered that plaintiff would be more dependent on people with whom he was familiar, that is, members of his family, and if gullible would accept information he was given without question. The doctor admitted that alcoholism was probably the main factor causing his condition. Hilmar W. Hoefel was released from the hospital on

February 7, 1968, and then was placed in a convalescent home where he remained until May of 1968. Kenneth, because of his father's condition, started taking care of his father's business affairs in that he took over the chore of writing checks on his father's checking account and depositing dividends and other income to it. Disbursements were made to take care of the hospital, convalescent, and medical costs, and the monthly expenses associated with the maintenance of his father's home.

After plaintiff was released from the convalescent home about the last of April, 1968, Kenneth visited him in his home, took him to the doctor, and observed that his father had returned to drinking. He would see beer bottles at various places about the house, and in opening the icebox door, would find it full of beer. On June 16, 1968, plaintiff called Kenneth and told him that he had fallen, and suggested that he come over. Kenneth and his wife went over to his father's house and found that Mr. Hoefel had a big bruise on his arm and was in a very shaky and nervous condition. They arranged to have him admitted to the hospital and took him there. Finding no fractures, and a major improvement on his condition after withdrawal from alcohol while in the hospital, plaintiff's doctor concluded that he should be confined to a nursing home for a long time in order that there might be complete withdrawal of alcoholic drinks. Kenneth had been advised of this conclusion by the doctor and on the date of discharge from the hospital, plaintiff was taken again to a nursing home in accordance with this recommendation. It was at this time, according to Kenneth, that he concluded that the stocks would have to be transferred because of his father having to go to a nursing home for a long time and because the stocks might have to be cashed in for an "emergency". A power of attorney was executed by plaintiff in favor of Kenneth. The stocks were removed from the safe deposit box of plaintiff on which Kenneth was a deputy, and stock powers were executed to transfer the stock in joint

names. This was done sometime during July of 1968. Plaintiff stated that he had no recollection of this transaction or of any of the papers which he signed in order to effect it. Kenneth, on the other hand, testified that his father had suggested that they might as well have everything put in three names and that the change be made.

Plaintiff remained in the nursing home until May of 1969. He then returned to his employment at Anheuser-Busch and remained there until he retired from his employment July 1, 1970. On September 12th of that year he was married to Imogene, now his widow and executrix of his estate.

The stocks, which were valued at some $105,000.00, after being transferred into the joint tenancy, were kept by Kenneth in a box in his name and the name of his brother in California. After his father returned from the convalescent home in 1969, Kenneth returned the stocks to his father's safe deposit box, and two weeks after Mr. Hoefel was married, he and his wife went to the safe deposit box and found the certificates of stock in joint tenancy with his sons. He testified that this is the first time that he was aware that the names of his sons had been placed on the certificates as joint tenants.

In the trial below, plaintiff contended and produced evidence in support of his contention, that the transfer of the stock into the names of himself and his sons was the result of undue influence exerted upon him by Kenneth while Kenneth was in a confidential relationship with him. He further contended that the transfer was done at a time when plaintiff lacked sufficient mental capacity to make a valid transfer; that it was done without authorization from plaintiff and was not a gift; and that there was no consideration for the transfer. Defendants denied the exertion of any undue influence upon their father, the lack of mental capacity, and affirmatively supported a theory of gift except for the income to be derived from the stocks for the remainder of plaintiff's life. They particularly relied upon an alleged family agreement by and between plaintiff and the defendants and their mother, Lorraine, which occurred after the mother found that she had cancer, whereby it was agreed that all of the parties would hold all of the property which had been accumulated during the lifetime of the parents and after their death it would be divided equally between the defendants Kenneth D. and Hilmar T. Hoefel.

After an adverse judgment by the trial court, the defendants on appeal contend essentially that the court's judgment in favor of plaintiff is not based upon clear, cogent and convincing evidence of undue influence, lack of sufficient mental capacity, and the other theories for restitution advanced by plaintiff and supported by plaintiff's evidence. No findings of fact and conclusions of law were requested and none were given. In this posture, all fact issues upon which no specific findings have been made are considered as having been found in accordance with the result reached. Upon appellate review, due regard is given to the opportunity of the trial court to judge the credibility of the witnesses, but we review the case upon both the law and the evidence as in suits of an equitable nature. Rule 73.01.

This is a suit between members of a family who were alive at the time of the trial of the case. It is not a situation where heirs are disputing with someone who was preferred over them by a deceased transferor. Under these circumstances, the trial judge had the benefit of the testimony of all parties to the transaction. In some of the evidence presented to the court there is conflict, and the trial court chose to believe plaintiff and his witnesses, accepting his theory of the case and his evidence. Deference should be given the determination of fact issues by the trial judge. *Brunswick Corporation v. Briscoe*, 523 S.W.2d 115, 119[1] (Mo.App.1975); *Morris v. Holland*, 529 S.W.2d 948, 952[1, 2] (Mo.App.1975). As indicated by all of the testimony, there could be no question but that plaintiff was

critically ill from alcoholism and arteriosclerosis which had affected his mind in June and July of 1968 when the transfer of the stock interest was made. Even in his weakened condition, we have concluded that plaintiff knew something of what was going on and allowed the stock to be transferred into joint ownership with his sons so that in the event his condition became more critical or that he died, the sons would have a proprietary interest in the stocks. It is not the conclusion of the trial judge nor is it our conclusion that he intended to make a gift or to transfer this interest in the stock in 1968 in accordance with the so-called family agreement which was allegedly discussed and entered into orally in 1962.

Considering the defendants' evidence supporting a gift theory, it is obvious that under their version of the transfer, the father did not make a complete and unconditional transfer. The stock was to remain the father's as long as he lived. There was no intention of relinquishment of dominion over the property. The essentials of a gift of personal property are a present intention to make a gift on the part of the donor, a delivery of the property by the donor to the donee, and an acceptance by the donee whose ownership takes effect immediately and absolutely. *In re Estate of Wintermann*, 492 S.W.2d 763, 767[3] (Mo.1973); *Firestone v. Yoffie*, 494 S.W.2d 394, 398[3] (Mo.App.1973). The evidence does not show an intent at the time of the transfer to make a gift on the part of the plaintiff. The transfer was not accepted as a gift by Kenneth who consistently stated that the stock belonged to his father. The father furthermore was in a condition where he was so weak in mind that he could not recall even having made the transfer.

As to the alleged family agreement, in order for it to be binding it must measure up to the law's requirement of a contract that it be sufficiently definite to enable a court to determine its exact meaning and to definitely measure the extent of the promisor's liability. *Ogilvie v. Ogilvie*, 487 S.W.2d 40, 41[1] (Mo.App.1972). In 1962, when the family home and savings accounts were placed in joint names with the two sons by plaintiff and his wife, no action was taken by the parents at that time to make any change in their stock holdings. The stocks were retained in the joint names of husband and wife. To find that the transfer in 1968, some six years after an agreement was allegedly made, was in compliance with it would be breathing life into a family arrangement executory in nature and without any definiteness of terms. Such arrangements, because of their very nature and the inability of those who participate in them to agree on what was said and what was intended to be done, are "[m]ore honored in the breach than the observance."

The evidence does not indicate any actual fraud on the part of Kenneth who was instrumental in setting up the joint ownership of the stock. In fact, Kenneth testified in deposition and at the time of trial that although his father suggested that everything including the stocks be put in the three names of the father and the two sons, he considered the stocks to belong to his father. When his father made a request that the stocks be transferred to him after his discovery of the change in the name and his remarriage to Imogene, he responded by saying that he would have to check with his brother first and talk it over. Referring to him and his brother, he stated: "'We tried to protect him * * *.'" Even at time of trial he testified that he still considered the stocks to belong to his father. Hilmar T. Hoefel, the other son who was in California all the time these matters transpired, in response to a demand from his father for transfer of his interest in these stocks, replied in a letter dated March 18, 1971, "* * * I would want to wait until I have consulted with Kenneth and I would also want to visit with you and your wonderful new wife in order to personally meet her and to evaluate your future with her as man and wife." When asked as to whether he considered the

stocks to be his father's, he replied that he considered the family agreement that it was "our" stock, but nevertheless over the years even after the stocks were transferred over to the names of all three, Hilmar T. Hoefel had prepared his father's tax returns and had always indicated that the stock dividends were income of his father. Through all of the testimony of the sons, there is an obvious concern over the father making disposition of his property including the stocks so that they, the sons, would either receive a smaller share or no share at all. As to them, there is probably no doubt that their fears may be substantiated by what may transpire in the future in view of their father's attitude after their refusal to transfer the stock back in his name. But this does not place this court or any other court in the position of being the father's guardian to oversee the disposition of his property, unless he has been adjudicated incompetent, nor to direct the father with regard to the objects of his bounty. We are only concerned with the rights of the parties in this litigation and not with disposition of the property in the future outside of the issues here framed and the disposition here ordered.

 Plaintiff here sought restitution of the interest in his stocks which he transferred to his sons on the basis that the stocks had been transferred to them while he was in a weakened condition and they had used undue influence and in a sense constructive fraud to bring this about. It is our view that it is not necessary to prove actual fraud or constructive fraud in order to sustain plaintiff's position. Unjust enrichment or an unfair wrongful holding without any proof of fraudulent intent may be the basis for restitution of a person's property of which he has been unjustly deprived, and he may seek the aid of equity to restore him as rightful owner through any remedy which may be afforded by equity. *March v. Gerstenschlager*, 436 S.W.2d 6, 8[2] (Mo.1969); *Swon v. Huddleston*, 282 S.W.2d 18, 25[7–10] (Mo.1955); *Wallach v. Joseph*, 420 S.W.2d 289, 295 [4, 5] (Mo.1967);

*Skidmore v. Back*, 512 S.W.2d 223, 230[6] (Mo.App.1974). Although constructive trusts were the remedies sought or decreed in these cases, the principle of equity sustaining the decree remains the same irrespective of the remedy. "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement of the Law of Restitution, § 1. As stated in § 4 of Restatement of the Law of Restitution: "In situations in which a person is entitled to restitution, he is entitled in an appropriate case, to * * * : * * * (c) a decree by a court of equity that the title or possession of the subject matter be transferred to him * * * ."

The court below has determined the issues in favor of plaintiff. This determination is not erroneous. The judgment is affirmed.

DOWD and McMILLIAN, JJ., concur.