612 P.2d 1343

**BANK OF NEW MEXICO, a New Mexico Corporation, Plaintiff-Appellee,**

v.

**FREEDOM HOMES, INC., a New Mexico Corporation, Edward Anguiano, et al. Defendant-Appellant.**

**No. 4409.**

Court of Appeals of New Mexico.

May 6, 1980.

Anita P. Miller, McCulloch, Grisham & Lawless, Albuquerque, for defendant-appellant, Edward Anguiano.

Robert H. Clark, Ronald F. Horn, Keleher & McLeod, Albuquerque, for plaintiff-appellee.

Quincy D. Adams, Adams & Foley, Albuquerque, for receiver-appellee.

## OPINION

WOOD, Chief Judge.

This appeal involves dismissal of a counterclaim. We discuss: (1) a quantum meruit claim of an unlicensed real estate salesperson, and (2) a tort claim for wrongful interference with contractual relations.

Bank of New Mexico sought judgment against Freedom Homes, Inc. for the unpaid amount of certain promissory notes, foreclosure of mortgages securing the notes, a determination of lien priorities among the various lien claimants, and the immediate appointment of a receiver. Although the order of appointment does not appear in the appellate record, other trial court orders state that a receiver was appointed August 1, 1978.

A second amended complaint filed June 19, 1979 names Anguiano as a defendant on the basis that he claimed a lien against the mortgaged real property. Anguiano's answer admits he filed a lien claim on August 25, 1978. Issues involving this lien claim are not involved in this appeal.

Anguiano counterclaimed against the receiver and the Bank. The counterclaim against the receiver was dismissed with leave granted to file a separate action against the receiver. The dismissal of the counterclaim against the receiver is not involved in this appeal.

The Bank moved to dismiss the counterclaim against it on the basis that the counterclaim failed to state a claim upon which relief could be granted. This motion was granted; the appeal involves this dismissal. The dismissal being under R.Civ.Proc. 12(b)(6), we accept all well-pleaded facts as true and determine whether Anguiano could be entitled to relief under any state of facts provable under the counterclaim. *Runyan v. Jaramillo*, 90 N.M. 629, 567 P.2d 478 (1977).

*Quantum Meruit Claim of an Unlicensed Real Estate Salesperson*

The counterclaim alleges that "during the period prior to December, 1978 and continuing until June, 1979 . . . ANGUIANO worked as a real estate salesperson for . . . FREEDOM HOMES, INC."; that this work was "[p]ursuant to contract with FREEDOM HOMES, INC."; that Anguiano was "to receive compensation for each home sold"; that "[d]uring the period of December 21, 1978 through May 15, 1979 . . . ANGUIANO secured buyers for some twenty-eight (28) homes" in one of the subdivisions mortgaged to the Bank by Freedom Homes, Inc.

We do not know whether Anguiano's contract was, or was not, in writing. Accordingly, we do not consider § 47–1–45, N.M. S.A. 1978.

Section 61–29–1, N.M.S.A. 1978 makes it unlawful for any person to engage in the business of a real estate salesman without a license issued by the New Mexico Real Estate Commission. It is stipulated that Anguiano was unlicensed.

Section 61–29–2(D), N.M.S.A. 1978 provides that the licensing requirements do not apply, in certain situations, to owners of property "or to the regular employees thereof". Anguiano's claim is on the basis of a contract with Freedom Homes, Inc. and not as an employee.

Section 61–29–16, N.N.S.A. 1978 states:

No action for the collection of commission or compensation earned by any person as a real estate . . . salesman required to be licensed under the provisions of this act shall be maintained in the courts of the state unless such person was a duly licensed broker or salesman at the time the alleged cause of action arose.

Anguiano could not have recovered commission or compensation under his contract with Freedom Homes, Inc. because he was unlicensed. *Lakeview Invest., Inc. v. Alamogordo Lake Vil., Inc.*, 86 N.M. 151, 520 P.2d 1096 (1974); *Star Realty Company v. Sellers*, 73 N.M. 207, 387 P.2d 319 (1963).

Anguiano does not seek to recover from Freedom Homes, Inc. or under his contract with Freedom Homes, Inc. The counterclaim alleged that Anguiano "expended considerable time, effort, skill and expertise" in obtaining purchasers for the twenty-eight homes; that following commencement of the foreclosure action, the Bank "used the product of . . . [his] labor . . . by completing the sale of the homes . . . to the twenty-eight buyers"; that the Bank has received the benefit of Anguiano's labor and should be required to pay for this benefit in an amount equal to the reasonable value of Anguiano's services.

Whether the Bank did receive a benefit has not been determined. The issue is whether Anguiano could be entitled to relief. This depends on whether Anguiano can recover in quantum meruit from the Bank when he could not recover under his contract with Freedom Homes, Inc., because unlicensed.

Although this issue has not been expressly decided in connection with the compensation of a real estate salesperson, it has been decided under the Contractor's Licensing Act. *Kaiser v. Thomson*, 55 N.M. 270, 232 P.2d 142 (1951) affirmed the dismissal of a quantum meruit claim by Kaiser, who failed to allege he was a duly licensed contractor; "To give effect to this claim would be to . . . nullify plain statutory provisions to the contract." *Campbell v. Smith*, 68 N.M. 373, 362 P.2d 523 (1961) states: "One who has shown himself to be required to have a contractor's license cannot recover under quantum meruit in the absence of such license."

Section 61–29–17(A), N.M.S.A. 1978 declares it a misdemeanor to violate § 61–29–1, supra, which makes it unlawful to engage in the business of a real estate salesman without a license. To recover, Anguiano must rely on his unlicensed activities, made unlawful by § 61–29–17(A), supra. *Desmet v. Sublett*, 54 N.M. 355, 225 P.2d 141 (1950) states:

[A] person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party, or where he must base his cause of action, in whole or in part, on a violation by himself of the criminal or penal laws.

See *Measday v. Sweazea*, 78 N.M. 781, 438 P.2d 525, 26 A.L.R.3d 1386 (Ct.App. 1968).

Section 61–29–16, supra, states that *no action* for the collection of compensation by a real estate salesman required to be licensed *shall be maintained* in the courts of this state. Anguiano's claim for the reasonable value of his services was a claim for compensation. *Star Realty Company v. Sellers*, supra, states: "The Statute . . . prohibits an action based upon a claimed real estate action except by one licensed as provided by law."

We hold that Anguiano, an unlicensed real estate salesperson, cannot recover for the reasonable value of his services in connection with the twenty-eight home sales alleged in the counterclaim. This result, under New Mexico statutes and decisions, accords with decisions in other jurisdictions. *Wegmann v. Mannino*, 253 F.2d 627 (5th Cir. 1958); *Dixon v. Rollins*, 120 Ga.App. 557, 171 S.E.2d 646 (1969); *Bradley*

*v. Banks*, 260 So.2d 256 (Fla.App. 1972); *Isaquirre v. Echevarria*, 96 Idaho 641, 534 P.2d 471 (1975); *Wright v. Smith*, 105 R.I. 1, 249 A.2d 56 (1969); *Hale v. Kreisel*, 194 Wis. 271, 215 N.W. 227 (1927).

*Wrongful Interference with Contractual Relations*

■ The counterclaim alleges that when Anguiano "sought to enforce and collect on his justly owed realtor's commissions," the Bank retaliated by raising the price of the property which Anguiano "was attempting to buy from Defendant, FREEDOM HOMES"; that the Bank refused to complete the contract as agreed to by Freedom Homes, Inc. as a direct result of Anguiano's "attempt to enforce his legal rights"; that as a result of the Bank's "retaliatory actions" Anguiano "was unable to purchase the house at the previously agreed upon price and was forced to buy it at a higher price".

It is undisputed that the property was in receivership and, when sold to Anguiano, the receiver did the selling with court approval. How, then, did the Bank refuse to complete the contract?

In his brief, Anguiano asserts that the Bank "through the receiver, raised the price of a home which he had contracted to buy from" Freedom Homes, Inc. and, thus, interfered with his contract with Freedom Homes, Inc.

Anguiano relies on the following quotation from *Wolf v. Perry*, 65 N.M. 457, 339 P.2d 679 (1959):

> The general rule is that one who, without justification or privilege to do so, induces a third person not to perform a contract with another, is liable to the other for the harm caused thereby.
>
> *     *     *     *     *     *
>
> A necessary element of the tort . . is a showing that the defendant played an active and substantial part in causing the plaintiff to lose the benefits of his contract. There must be some voluntary conduct on the part of the defendant, some overt act which influences the promisor to breach his contract.

The contract allegedly interfered with was Anguiano's contract with Freedom Homes, Inc. We examine the various stages of the matter to determine whether there could have been a wrongful interference by the Bank.

First, the Bank filed the foreclosure action and sought appointment of a receiver. There is no claim that the Bank proceeded improperly in seeking appointment of a receiver. The mortgages contain a provision stating that if there should be default in payment of the note secured by the mortgage, Freedom Homes, Inc. "irrevocably consents to the appointment of a Receiver pendente lite".

Second, the receiver, appointed by the court, took possession of the property described in the mortgages. This property included the lot purchased by Anguiano. After inspecting the property, and being without funds, the receiver sought, and the court granted, permission to borrow money in order to complete sixty-nine dwellings which were "in a state of partial completion". The court's order states that the sale of the "completed structures will yield a much larger net return to the estate than their sale in their present condition" and that the dwellings "should be completed as quickly as possible to protect the material and labor in the improvements from deterioration, vandalism and waste." There is no claim that the receiver, or as Anguiano claims, the Bank acting through the receiver, proceeded improperly in preserving receivership assets and in seeking a greater net return to the receivership estate.

Third, the counterclaim alleges that Anguiano was "attempting to buy" from Freedom Homes, Inc. The contract was executory. *Waddell v. Shelton Gasoline Co.*, 101 W.Va. 468, 133 S.E. 75 (1926) states:

> [A] receiver is not bound to adopt or to perform executory contracts of the corporation for whom he is receiver  .  .  . .
> A receiver is not bound to carry out the executory contracts of the corporation, but he may disregard them.

See *United States Trust Co. v. Wabash Western Railway*, 150 U.S. 287, 37 L.Ed.

1085, 14 S.Ct. 86 (1893); *Fauci v. Mulready*, 337 Mass. 532, 150 N.E.2d 286 (1958).

The receiver did not adopt the contract Freedom Homes, Inc. had with Anguiano; this is established by the claim that Anguiano was unable to purchase at the previously agreed upon price.

The record shows that the receiver proposed a plan for the sale of the houses upon being completed. The proposed plan, set forth by the receiver in his first report states:

> 9. That Receiver has determined the deposit paid by prospective home buyers was deposited in trust accounts and is available to be returned to the prospective home buyer when proper request or claim is made for return of the earnest money deposit.
>
> \*     \*     \*     \*     \*     \*
>
> 11. That the Receiver proposes that each home buyer be given the first opportunity to buy the improvements at appraised, fair market value as determined independently by a qualified appraiser so that each home buyer is given an alternative either to have returned the earnest money deposit or to purchase the house with credit to be given for the earnest money deposit.

The court approved this proposed plan.

Ultimately, the receiver sold a lot, with completed house, to Anguiano; there is no claim that the lot was other that the lot in Anguiano's contract with Freedom Homes, Inc.

We understand Anguiano's interference claim to be that the Bank caused the receiver not to adopt the contract between Anguiano and Freedom Homes, Inc.; that the sale by the receiver to Anguiano, in accordance with the court-approved sale plan, was a retaliatory action which was wrongful; that this retaliatory action was by the Bank, acting through the receiver. We assume, but do not decide, that this claim was a "contract" interference claim. However, see Annot., 9 A.L.R.2d 228 (1950).

Anguiano could not be entitled to relief on this claim; the claim disregards the Bank's position. The Bank's second amended complaint alleged an indebtedness to it, under the promissory notes, of a principal sum exceeding two and one-fourth million dollars, mortgages on the property of Freedom Homes, Inc. securing payment of the promissory notes, and default in payment. The Bank, no different than other lien claimants, had a financial interest to protect.

> [A] receiver should reject any executory contract . . . the performance of which will be burdensome and deplete the receivership estate. *Fauci v. Mulready*, supra.

Adoption of Anguiano's contract with Freedom Homes, Inc. would have resulted in fewer receivership assets because of its lower price. The receiver sought to increase the assets of the receivership by selling the completed homes at appraised value, giving Anguiano the option of buying at the appraised price or a return of his deposit. The trial court approved this plan, and approved the sale to Anguiano.

If, as Anguiano contends, the Bank was acting through the receiver, any interference by the Bank in getting the receiver to propose, and the trial court to approve, a plan to increase assets of the receivership, was not wrongful even if the Bank's motive was, in part, retaliatory against Anguiano. The Bank was privileged to interfere to protect its financial interest. *Williams v. Ashcraft*, 72 N.M. 120, 381 P.2d 55 (1963). There being no claim that the Bank's purpose was improper in seeking to increase the assets of the receivership, see paragraph second above and *Williams v. Ashcraft*, supra, Anguiano could not be entitled to relief for this interference.

Fourth, the actual sale to Anguiano by the receiver provides no basis for an interference claim. Anguiano does not claim that this sale was not in accord with the court-approved sale plan or that the price was not the appraised price.

The order dismissing Anguiano's counterclaim against the Bank is affirmed.

IT IS SO ORDERED.

LOPEZ, J., concurs.

SUTIN, J., dissenting.

SUTIN, Judge (dissenting).

I dissent.

The issues in this case are:

(1) Does the first count of Anguiano's counterclaim for unjust enrichment state a claim upon which relief can be granted?

(2) Does the second count of the counterclaim for interference with a contractual relationship state a claim upon which relief can be granted?

A. *The first count of Anguiano's counterclaim states a claim for relief.*

Count I of Anguiano's counterclaim, when summarized, alleges:

(1) That Anguiano worked as a real estate salesperson for Freedom Homes and secured buyers for 28 homes and was to receive compensation for each home sold.

(2) Following commencement of its foreclosure action, the Bank of New Mexico used the product of Anguiano's labor in obtaining and securing buyers by completing the sale of the home to the 28 buyers whom Anguiano had obtained.

(3) The Bank of New Mexico unjustly enriched itself in the sum of $50,400 because the Bank saved the expense or loss of paying a realtor's commission and/or paying its own agents or employees to seek out qualified buyers to sell the property to them.

(4) Anguiano's services had a reasonable value of $50,400.

The doctrine of "unjust enrichment" is a matter of first impression. It is not contractual but equitable in nature. *State v. Martin*, 59 Ariz. 438, 130 P.2d 48 (1942). It is a maxim of equity that there is no right without a remedy. *Armijo v. Town of Atrisco*, 62 N.M. 440, 312 P.2d 91 (1957). We should, therefore, search for the essential factors of this doctrine to determine whether Anguiano has a claim for relief.

It is a fundamental doctrine of equitable jurisprudence that it will exercise its extraordinary powers only to the end that justice may be done in each individual case presented. *Pugh v. Phelps*, 37 N.M. 126, 19 P.2d 315 (1932). "It has often been said

that the office of equity is to supply defects in the law." 27 Am.Jur.2d Equity § 2 (1966); *Pearcy v. Citizens Bank & Trust Co. of Bloomington*, 121 Ind.App. 136, 96 N.E.2d 918 (1951). It also supplies a defect in the legal remedy, *Donovan v. Kansas City*, 352 Mo. 430, 175 S.W.2d 874 (1943), where remedies thereunder are inadequate to do complete justice, *Swogger v. Taylor*, 243 Minn. 458, 68 N.W.2d 376 (1955).

We recognize that Anguiano has no remedy by way of quantum meruit for services rendered as a real estate salesperson because he was not licensed under New Mexico law. This is the point at which equity enters to supply the remedy of restitution. Restatement of the Law of Restitution, § 1 (1937). It reads:

> A person who has been unjustly enriched at the expense of another is required to make restitution to the other.

The comments are broad and significant. In summary, as applied to the instant case, a person is enriched if he has received a benefit. A person confers a benefit upon another if he performs services beneficial to the other or saves the other from expense or loss. A person in unjustly enriched if the retention of the benefit would be unjust. If, as between the two persons, the circumstances are such that the retention of the benefit is unjust, then the person who has received the benefit is liable to pay therefor.

"The injustice must be one for which the law gives redress under its rules." *American University v. Forbes*, 88 N.H. 17, 183 A. 860, 862 (1936). To state a guideline, the court said:

> The doctrine of unjust enrichment is that one shall not be allowed to profit or enrich himself at the expense of another contrary to equity. While it is said that a defendant is liable if "equity and good conscience" requires, this does not mean that a moral duty meets the demands of equity. There must be some specific legal principle or situation which equity has established or recognized to bring a case within the scope of the doctrine. [Id. 862.]

For the application of these rules in recent cases, see, *Monarch Accounting Supplies v. Prezioso*, 170 Conn. 659, 368 A.2d 6 (1976); *Sharp v. Kosmalski*, 40 N.Y.2d 119, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976); *Reiver v. Safeguard Precision Products, Inc.*, 240 Pa.Super. 572, 361 A.2d 371 (1976); *Harp v. Town of Lake Providence*, 338 So.2d 169 (La.App. 1976); *Hoefel v. Hoefel*, 533 S.W.2d 704 (Mo.App. 1976); *United States v. Long*, 537 F.2d 1151 (4th Cir. 1975); *Evans v. Evans*, 237 Ga. 549, 228 S.E.2d 857 (1976); *Farmer v. Groves*, 276 Or. 563, 555 P.2d 1252 (1976).

*Monarch* says:

The measure of recovery in this case focuses on the benefit to the defendant rather than on the loss to the plaintiff. The damages should be the benefit received.   .   .   .   [170 Conn. 659, 368 A.2d 10.]

Anguiano does not seek to recover damages for the services performed as a real estate salesperson. The quantum meruit claim of an unlicensed real estate salesperson is not an issue in this case. Anguiano seeks to recover the benefits that the Bank of New Mexico received by capturing the buyers that Anguiano had discovered. An equitable remedy has been provided. Anguiano has the right to seek the aid of equity through any remedy afforded by equity. *Hoefel, supra.* As *Sharp* said:

.   .   .   This case seems to present the classic example of a situation where equity should intervene to scrutinize a transaction pregnant with opportunity for abuse and unfairness. It was just this type of case that there evolved equitable principles and remedies to prevent injustices. Equity still lives.   .   .   .   [40 N.Y.2d 119, 386 N.Y.S.2d 6, 351 N.E.2d 724.]

The purpose of this discussion is not to indicate that Anguiano will succeed by way of restitution. See *Freedline v. Cielensky*, 115 Ohio App. 138, 184 N.E.2d 433 (1961); *Evans, supra; Farmer, supra.* Its purpose is to declare that Anguiano's first count in "unjust enrichment" states a claim for relief.

Other than by restitution, the prevention of unjust enrichment has been attempted in many ways: (1) by the theory of constructive trusts, *Hanson v. Valdivia*, 51 Wis.2d 466, 187 N.W.2d 151 (1971); *McClanahan v. McClanahan*, 79 Ohio App. 231, 72 N.E.2d 798 (1946); (2) by money had and received, *Hummel v. Hummel*, 133 Ohio St. 520, 14 N.E.2d 923 (1938); *Seekins v. King*, 66 R.I. 105, 17 A.2d 869 (1941); (3) Assumpsit, *Herrmann v. Gleason*, 126 F.2d 936 (6th Cir. 1942); (4) a Bill in Equity, *American University, supra* ; (5) Trespass, *Bill v. Gattavara*, 34 Wash.2d 645, 209 P.2d 457 (1949).

B.   *The second count of Anguiano's counterclaim states a claim for relief.*

Count II of Anguiano's counterclaim, when summarized, alleges:

(1) That it realleges all allegations made in Count I.

(2) When Anguiano "sought to enforce and collect on his justly owed realtor's commissions," the Bank of New Mexico retaliated by raising the price of the property he was attempting to buy from Freedom Homes.

(3) The Bank refused to complete the contract as agreed to by Freedom Homes as a direct result of Anguiano's attempt to enforce his legal rights.

(4) Anguiano was unable to purchase the house at the previously agreed upon price and was forced to buy it at a higher price to his damage.

Count II was not carefully prepared to state a claim for "Interference with a Contractual Relationship." But all that Rule 8(a) of the Rules of Civil Procedure requires is " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80, 25 FR Serv. 8a. 25, Case 2 (1957); 2A Moore's Federal Practice, ¶ 8.13, p. 8–104 (1979); *Malone v. Swift Fresh Meats Co.*, 91 N.M. 359, 574 P.2d 283 (1978). See *Wolf v. Perry*, 65 N.M. 457, 359 P.2d 679 (1959); *Acme Cigarette Services, Inc.*,

*v. Gallegos*, 91 N.M. 577, 577 P.2d 885 (Ct. App. 1978).

Count II states a claim upon which relief can be granted.

C. *Summary dismissal of complaint is inappropriate unless reasons stated.*

The trial court dismissed Anguiano's counterclaim for failure to state a claim upon which relief can be granted. The popularity of this practice often occurs due to lack of care in preparation of complaints. But "notice pleadings" were adopted to cure the practice of pleading facts and evidence in the common law style as well as the hurry and speed used in preparation. Hurry and speed should be the antipodes of a lawyer's behavior. Of course, when the dismissal is affirmed on appeal, the trial docket is relieved. However, if a district court believes that a complaint fails to state a claim for relief, the reasons should be stated. Opportunities for amendment should be granted unless there is no basis upon which a legal claim can be made.

The purpose of this discussion is not to foster frivolous claims or counterclaims. If the court is satisfied that such claims have been filed, it should not hesitate to state its reasons for dismissal.